## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**TURKCELL İLETİŞIM HIZMETLERI A.Ş.**
Turkcell Plaza, Mesrutiyet Caddesi No: 71 34430
Tepebasi, Istanbul, Turkey;

**EAST ASIAN CONSORTIUM B.V.**
Rokin 55, 1012 KK, Amsterdam, The Netherlands;

      Plaintiffs,

vs.

**MTN GROUP, LTD.**
216 14th Avenue, Fairlands 2195
Private Bag 9955, Cresta, 2118
South Africa;

**MTN INTERNATIONAL (MAURITIUS) LTD.**
Suite 525, 5th floor Barkly Wharf, Le Caudan
Waterfront, Port Louis, Mauritius;

      Defendants.

Civil Action No.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs, Turkcell İletişim Hizmetleri A.Ş. and East Asian Consortium B.V. ("Turkcell"), by its undersigned attorneys, bring this action against MTN Group, Ltd. and MTN International (Mauritius) Ltd. (collectively "MTN Group" or "MTN") under the Alien Tort Statute, 28 U.S.C. § 1350, for harm MTN caused to Turkcell for violation of the law of nations through bribery of sitting Iranian and South African officials and trading in influence to steal the first private Iranian Global System for Mobile Communications ("GSM") license (the "License") from Turkcell. MTN's corrupt acts included: (1) promising Iran that MTN could deliver South Africa's vote at the International Atomic Energy Agency ("IAEA"); (2) promising Iran defense equipment otherwise prohibited by national and international laws; and (3) the outright bribery

of high-level government officials in both Iran and South Africa.   These acts successfully frustrated Turkcell's ability to close on the License that Turkcell had legitimately won through an international tender process.   MTN's actions deliberately resulted in Turkcell losing its rightfully-won valuable telecommunications opportunity and in MTN's taking over the License, causing substantial direct harm to Turkcell.

## INTRODUCTION

1.      In 2003 the Government of Iran launched an international tender for the first private GSM License made available to companies outside Iran to build out Iran's cellular network.   The License tender was understood at the time to be the largest new international telecommunications opportunity in the world and was known to involve the largest single investment opportunity into Iran since the 1979 Revolution.   Multiple companies participated in the tender, and in February 2004, Iran announced Plaintiff Turkcell as the winning bidder.

2.      The runner up bid for the GSM License had been submitted through a subsidiary by Defendant MTN Group, an international telecommunications conglomerate based in South Africa.   Upset by its loss of the open competition, MTN sought to obtain illegally what it could not obtain through honest competition, and thereafter embarked on a premeditated program of corruption through bribery and trading in influence to prevent Turkcell from actually securing the License and instead to obtain for itself the License and the corresponding exclusive multi-year market opportunity.

3.      Four high-level MTN Group executives were at the center of MTN's actions to take the License from Turkcell.   During the time period relevant to this Complaint, Cyril Ramaphosa was (and remains) MTN Group's Chairman; Phuthuma Nhleko (now retired from

MTN) was MTN Group's Chief Executive Officer; Sifiso Dabengwa (current Chief Executive Officer of MTN) was the Chief Operating Officer; and Irene Charnley (now retired from MTN) was the Commercial Director.[1]   Each of these four individuals directed the activities described below, were principal decision makers and architects of the MTN strategy, were directly involved in the approval of the actions taken by MTN, and were directly involved in the activities set forth herein.

4.      MTN used its high-level political influence within the South African government to offer Iran the two most important items that the country could not obtain for itself:  (1) support for the Iranian development of nuclear weapons; and (2) the procurement of high-tech defense equipment.  MTN developed a scheme to trade these items – nuclear votes and illicitly procured arms – for the License.  MTN furthered its scheme by bribing and trading in influence with government officials in both Iran and South Africa in exchange for the License.

5.      MTN went so far as to create a code name for its corrupt scheme—"Project Snooker."  Between February 2004 and November 2005, MTN Group worked feverishly to "snooker" its business competitor through these corrupt arrangements.

6.      MTN succeeded in its scheme by engaging numerous Iranian officials, all of whom it knew to be connected to the Iranian defense establishment and to the so-called "Supreme Leader" in its efforts.  MTN openly and brazenly discussed the conspiracy at the highest corporate levels.  For example, on September 21, 2005, one month before Project Snooker successfully ousted Turkcell, Phuthuma Nhleko, MTN Group's Chief Executive Officer, delivered a confidential memorandum to MTN Group's leadership, Sifiso Dabengwa,

_____

[1] A Cast of Characters is provided at Appendix A.

Robert Nisbet (MTN's former Chief Financial Officer), and Irene Charnley, detailing the scheme:

> The Ministry of Defence, Government controlled banks and companies, together with [the] Government essentially control all the commercial activity in the country. Consequently, a conventional mindset, orthodox financial and operational approach to this project is unlikely to provide us with an outcome that I would feel comfortable to recommend to the board on an investment of over €400 million . . . into Snooker. It is therefore imperative to think laterally on how we can secure the investment . . . .

A true and correct copy of this memorandum is attached hereto and incorporated by reference as Exhibit A.

7.      Working behind the scenes to bribe, corrupt, and control officials from the Iranian and South African governments, on November 24, 2005, MTN secured South Africa's abstention on a crucial decision at the IAEA. Indeed, just before the GSM License was to be transferred to MTN, the Iranian government explicitly demanded, as a condition of MTN's obtaining the GSM License, that MTN ensure that South Africa (then a recent Member of the IAEA Board of Governors) vote against referring Iran to the United Nations Security Council.

8.      MTN immediately went to work and arranged for South Africa's vote to come out the "right" way. Three days later, and only after MTN delivered as promised at the IAEA, did Iran actually deliver it the coveted License, which had been won by Turkcell.

9.      The nuclear vote was part of MTN's greater scheme to exploit its political influence and take out Turkcell. Between the end of 2004 and receiving the License in November 2005, MTN through "Project Snooker" made at least five illegal bribes and trades in influence to government officials with the intention and belief that the bribes would cause the Iranian government to grant the License to MTN rather than Turkcell:

4

A.     Trade of Influence to Secure the IAEA Vote:  As part of MTN's promise to deliver to the Iranian government South Africa's vote at the IAEA, MTN arranged a private meeting between then-South African President Thabo Mbeki and the Iranian National Security Advisor and the nuclear negotiation chief, Hassan Rowhani.  Advisor Rowhani was sent directly by the Supreme Leader of Iran to communicate with MTN.  MTN used this meeting to show the Iranian Ministry of Defense that MTN was powerful enough to obtain presidential support.   MTN also used its close relationship with the South African Ambassador to Iran, Yusuf Saloojee, to receive assurances that the South African Ambassador to the IAEA, Abdul Minty, would not support referring Iran to the Security Council.

B.     Illicit Arms for the GSM License:  MTN struck a deal to deliver "The Fish" to the Iranian Ministry of Defense in August 2004.  "The Fish" was a code name for a combination of military cooperation and big ticket defense equipment, including Rooivalk helicopters (based on the U.S. Apache platform), frequency hopping encrypted military radios, sniper rifles, G5 howitzers, canons, armored personnel and landmine-proof carriers, radar technology, pilot "head's up" display technology, and other defense articles—particularly items including U.S. systems or components.   This equipment was unavailable to Iran through legitimate means because of U.S. and international restrictions at the time.  MTN officials used their personal relationships with Mosiuoa Gerard Patrick "Terror" Lekota, the South African Minister of Defense, to promise delivery of the elicit arms and technology in exchange for the License.

C.   <u>Bribe of Iranian Deputy Foreign Minister:</u>  MTN promised in May 2005, and later paid through a sham consultancy agreement, the Iranian Deputy Foreign Minister, Javid Ghorbanoghli, $400,000 in U.S. dollars for his efforts to politically undermine and destroy Turkcell's position as the license-holder and to deliver the License to MTN.

D.   <u>Bribe of South African Ambassador to Iran:</u>   In June 2005, MTN promised, and later paid, the South African Ambassador to Iran, Yusuf Saloojee, the equivalent of U.S. $200,000 to help MTN deliver on the nuclear vote and the weapons trafficking and to support MTN within the Iranian government. Ambassador Saloojee was integral to MTN's ultimate success in securing the License.

E.   <u>Bribes of Iranian Defense Organizations:</u>   MTN promised the Iranian Ministry of Defense through its state-owned defense company Sairan (also known as Iran Electronic Industries or "IEI") and the "Bonyad" (one of the five Iranian quasi-independent "Charitable Foundations," an organization integral to the Iranian defense establishment), that MTN would pay all of Sairan and the Bonyad's 51% share of the €300 million license fee, plus its entire capitalization cost and a share transfer tax, in exchange for their assistance within the Ministry of Defense and with the Supreme Leader.  MTN later paid these amounts.  These promises and payments, made through sham loans MTN knew at the time would not be repaid, were essential to MTN's takeover of Turkcell's License.

10.   In addition, MTN arranged and paid for sitting government officials to visit South Africa or Iran, respectively, relating to MTN's promised defense cooperation.  For example, in

August 2004, MTN organized and paid for a trip to Iran by South African Minister of Defense Lekota, who had a personal relationship with MTN's executive, Irene Charnley.   MTN executives accompanied Minister Lekota during the entirety of his trip to Iran.  It was during this visit that they together promised the Iranian Minister of Defense that MTN would ensure South Africa delivered "The Fish."

11.      MTN also paid for a trip to South Africa by National Security Advisor Rowhani, Iran's nuclear negotiator, to meet with South African President Mbeki, on whom MTN, through its Directors Irene Charnley and Cyril Rhamaphosa, was able to call through its deep political connections.  MTN paid Advisor Rowhani's full expenses for traveling to Cape Town, including payments for the private entertainment of Advisor Rowhani and his delegation during the trip. MTN also paid for Ambassador Saloojee to accompany Advisor Rowhani.  During that trip, MTN arranged for an "off the record" meeting between Advisor Rowhani and President Mbeki to take place at the President's residence during lunchtime.

12.      MTN expected that its actions would result in the Iranian government blocking each and every step that Turkcell needed to take to finalize its agreements under its winning tender bid.  While Turkcell remained willing and able to consummate its obligations under its successful tender, and while Turkcell took each and every action needed to conclude the needed arrangements, MTN and its Iranian emissaries prevented Turkcell from being issued the License due directly to MTN's illegal corruption and bribery of Iranian and South African officials.  As a result, MTN's strategy succeeded, and on November 27, 2005, MTN displaced Turkcell and received the License.

13.      Subsequent events and MTN's own documents confirm the illicit exchanges. After receiving the License in exchange for its promises, MTN reported in March 2007 that Iran

was calling upon MTN to deliver on its defense promises and reminded MTN of the bargained

for exchange:

> [The Iranian Ministry of Foreign Affairs] and the current
> President  did not agree with the removal of Turkcell from
> the Irancell consortium but they were finally convinced by
> the office of the Supreme Leader that there are significant
> defence benefits in it for the country were MTN to be
> allowed into the process.
>
> On that basis they withdrew their objections and allowed
> the process to proceed in MTN's favour.
>
> * * *
>
> It will be recalled that MTN only seriously got back into
> the process after our MOD [Minister of Defense Lekota]
> visited the country. . . .
>
> * * *
>
> [MTN's CEO, Phuthuma Nhleko should] attempt as a
> matter of urgency to contact POSA [the President of South
> Africa] and impress upon him that the failure to resolve the
> defence matters to the satisfaction of Iran will have severe
> negative repercussions for MTN.

A true and correct copy of this March 25, 2007 MTN memorandum is attached hereto and

incorporated by reference as <u>Exhibit B</u>.


## PARTIES

14.     Plaintiff Turkcell İletişim Hizmetleri A.Ş. is a joint stock company organized

under the laws of the Republic of Turkey.  Its principal place of business is in Istanbul, Turkey,

and its mailing address is Turkcell Plaza, Mesrutiyet Caddesi No: 71, 34430 Tepebasi, Istanbul,

Turkey.

15.     Turkcell is the leading Turkish telecommunications company and is publicly traded on the New York Stock Exchange.  It enjoys 34.4 million subscribers, and it is the third largest GSM operator in Europe.  Turkcell's shareholders, including its American shareholders, have been directly damaged by the events described in this Complaint.

16.     Plaintiff East Asian Consortium, B.V., is a private company with limited liability organized under the laws of the Netherlands.  Its principal place of business is in Amsterdam, The Netherlands, and its mailing address is Rokin 55, 1012 KK Amsterdam, The Netherlands.

17.     East Asian Consortium is a wholly owned subsidiary of Turkcell that was to have partnered with the Iran Electronic Development Company ("IEDC"), comprised of Sairan and the Bonyad, and another Iranian company, Parman Ertebat (together the "Irancell Consortium"). The Irancell Consortium was Turkcell's local Iranian partner in a joint venture that bid for and won the GSM License tender.

18.     Defendant MTN Group, Ltd., is a limited liability company organized under the laws of the Republic of South Africa.  Its principal place of business is in Roodepoort, South Africa, and its mailing address is 216 14th Avenue, Fairlands 2195, Private Bag 9955, Cresta, 2118, South Africa.

19.     MTN Group is a multinational telecommunications group that operates throughout the world.  Its U.S. services and cellular coverage are necessary elements of MTN Group's success as an international cellular services provider.

20.     MTN Group, acting through a conglomerate of subsidiaries, provides services in and derives substantial revenue from continuous operations in the United States.

21.     Defendant MTN International (Mauritius) Ltd. ("MTN Mauritius") is a wholly owned and controlled subsidiary of MTN incorporated under the laws of the Republic of

Mauritius.  Its principal place of business is in Port Louis, Mauritius, and its mailing address is 5th Floor, Barkly Wharf, Suite 525, Le Caudan Waterfront, Port Louis, Mauritius.

22.     MTN Group uses MTN Mauritius as a vehicle to sidestep South African currency export controls.  MTN Mauritius owns a 49% interest in MTN-Irancell (the group ultimately formed by MTN to receive the License), as approved by MTN Group.  Indeed, MTN Group and its former Board (including the Chairman Cyril Ramaphosa, CEO Phuthuma Nhleko, COO Sifiso Dabengwa, and Commercial Director Irene Charnley) were direct participants in the matters at issue in this case.


**JURISDICTION AND VENUE**

23.     Because Turkcell is an alien, this Court has subject matter jurisdiction over its claims against MTN Group involving torts committed in violation of the law of nations or treaties of the United States pursuant to 28 U.S.C. § 1350.  This Court has supplemental subject matter jurisdiction over claims arising under District of Columbia law pursuant to 28 U.S.C. § 1367(a) because such claims form part of the same case or controversy giving rise to the federal claims.

24.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(d) because MTN Group is an alien.

25.     This Court may exercise specific personal jurisdiction over MTN because it breached the Confidentiality Agreement it entered with Turkcell in the District of Columbia by publishing confidential information in the District of Columbia.  Specific personal jurisdiction also arises out of MTN's knowing and intentional defamatory statements that were published in

the District of Columbia falsely accusing Turkcell of criminal acts and attacking Turkcell's reputation.  D.C. Code § 13-423.

26.     As set forth below, this Court may also exercise personal jurisdiction over MTN and its named subsidiary pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and D.C. Code § 13-334(a) because its contacts with the District of Columbia are sufficiently continuous and systematic so as to render it at home here.  Alternatively, this Court may exercise personal jurisdiction over MTN based on its aggregate contacts with the United States as a whole pursuant to Federal Rule of Civil Procedure 4(k)(2) because exercising personal jurisdiction would be consistent with the United States Constitution and laws.

27.     MTN Group has a unity of ownership and interest with each of it subsidiaries. With the sole exception of MTN-Irancell, the entity formed as a result of MTN's bad acts for which Turkcell complains, MTN Group maintains a controlling, majority ownership interest in each of its subsidiaries.

28.     All management decisions at issue here executed by MTN Mauritius were made and directed by MTN Group, or MTN Group had the final authority over any subsidiary-made management decisions.  MTN Group was directly involved in, and had direct decisional authority over, the matters alleged in this Complaint.

29.     The Board of Directors of MTN Group can, and did, specifically direct MTN subsidiary companies to undertake actions or make expenditures.

30.     Because ownership and ultimate unfettered management authority lie with MTN Group, it dominates and controls each of its subsidiaries.

31.     MTN Group has abused its corporate form to perpetuate egregious wrongs.

32.     MTN Group exercised its control over its subsidiaries, including MTN Holdings, MTN International, MTN South Africa, MTN Mauritius, MTN-Irancell, and MTN Management Services, among others, to compose and execute its staggeringly brazen orchestra of corruption. Each subsidiary had a role to play, and each of their actions in MTN's scheme was controlled from the top – MTN Group.

33.     Because the MTN companies (collectively "MTN") have unity of ownership and interest, MTN Group is able to dominate and control each marionette-subsidiary; they are all but alter-egos of one another.

34.     The jurisdictional contacts of each MTN company should be attributed to MTN Group and the MTN organization as a whole.

35.     MTN has entered into agreements that allow its customers, including its MTN-Irancell subscribers, to obtain cellular telephone service while traveling in the United States. This service is called "roaming."

36.     MTN is able to provide its customers with roaming cellular telephone service in the United States through lucrative roaming agreements with U.S. cellular carriers.

37.     For example, the MTN's subsidiary at issue here, Irancell, publicly lists its U.S. partners as "Cingular Wireless (Bellsouth, Pacbell, Genesis), AT&T and T-Mobile."

38.     MTN South Africa lists its U.S. roaming partners as Cingular East (BellSouth PCN), AT&T Wireless Services, T-Mobile, Nextel USA, Manx Telecom North America, North East Colorado Cellular, Inc., and M3 Wireless (Mobility), among others.

39.     On information and belief, MTN moves multiple millions of dollars per month through U.S. bank accounts resulting from roaming agreement payments.

40.     Because of the services that MTN makes available in the United States through its roaming arrangements, a significant percentage of MTN's call volume originates in the United States, and a significant percentage of calls on the MTN network are directed toward the United States.

41.     Unlike many typical international cellular telephone service providers that provide roaming services in the United States, MTN's business dealings and contacts with the United States are far more extensive.  By way of example, MTN offers a "global top-up" service in the United States.  This is a service that permits individuals in the United States to purchase airtime for MTN subscribers.  MTN advertises these global top-up services on the Internet.  This global top-up website, www.mtntopup.com/usa.php, is not a foreign website that just happens to be accessible through any Internet connection.  Rather, it expressly and intentionally targets and advertises to people in the United States.

42.     MTN advertises, for example, that "MTN Global Top Up [is] Available [at] strategic locations in major cities in the United States."

43.     MTN's advertisement is accurate.  It offers its MTN Global Top Up services at over 7,700 locations throughout the United States in cooperation with Sochitel, at 6,200 7-Eleven stores, including 7-Eleven stores in the District of Columbia, and at over 1,500 NowPrePay locations at participating retailers.

44.     MTN sells its customers in the United States vouchers that they can bring to any one of the more than 6,200 locations in the United States, including locations in the District of Columbia, to purchase MTN airtime.

45.     On information and belief, MTN also sells a high number of calling cards in the United States.

46.     Beyond deriving significant revenue from roaming agreements, directly advertising services to customers in the United States, and having approximately 8,000 U.S. service locations available to its United States customers, MTN engages in still further activity in the United States.

47.     MTN has sold American Depository Receipts ("ADRs") and engaged in over-the-counter transactions in the United States, and has made filings with the U.S. Securities and Exchange Commission in connection with the sale of its ADRs.  MTN expressly targets U.S. investors through advertisements for its ADR program at www.mtn.com/ Investors/Shares/Pages/ADRProgramme.aspx, including providing contact information for its ADR Level 1 Programme at the Bank of New York, 101 Barclay Street, New York, NY 10286. MTN's ADR dividends are paid in U.S. dollars.

48.     MTN also transacts significant amounts of business with United States entities. For example, MTN collaborates with Facebook in Palo Alto, California to operate "Facebook ZERO" in the United States, this District, and elsewhere.  "Facebook ZERO" is a mobile platform designed to provide MTN customers with free mobile browsing on the world-wide social networking Internet website Facebook.  Also, in December 2011, American Tower Corp., a Boston, Massachusetts corporation, and MTN announced their agreement to form a joint venture to place and operate broadcast and wireless towers in Uganda.

49.     MTN also has entered into a contractual relationship with Santa Clara, California-based Intel Corp. to deploy broadband access in Africa and the Middle East, and MTN has contracted with Cisco Systems for the construction of a data center.  MTN has established business relationships with many other U.S. companies, including Intec, Microsoft, and HP.

50.     Upon information and belief, MTN leases U.S. satellite services, and it regularly and routinely broadcasts signals for its operations using American satellites.  MTN has come and continues to come to the United States to do business with Intelsat, a company with administrative headquarters in Washington, D.C.  MTN contracts with Intelsat to host its cellular network platform and to lease Intelsat satellites to enhance its worldwide broadcast abilities.

51.     MTN has longstanding and significant U.S. banking relationships and does business in the United States on a frequent basis.  MTN receives billions of U.S. dollars in financing to support its business.  It has received syndicated financing supported by Morgan Stanley, Bank of America Merrill Lynch, Citibank, Goldman Sachs, and JPMorgan.  For example, in 2007, MTN received a loan of approximately $2 billion, in which Citibank was a primary lender.

52.     MTN's Directors also reside in the United States, and in and near this District.  For example, just after MTN received the GSM License at issue in this action, and while MTN was circulating a "TOP SECRET" memorandum regarding continued defense cooperation, one of MTN's directors, Peter Woicke, resided in the District of Columbia.

53.     One of MTN's subsidiaries, MTN Nigeria, also has a director who resides or does business in Potomac, Maryland, Joseph Solan.

54.     MTN derives substantial revenue from its operations in the United States; MTN advertises services and investment opportunities in the United States to customers here; MTN has substantial business dealings in the United States; members of MTN's management reside in or have resided in the United States; and, through its ADR program, MTN securities are traded here.  In short, MTN's contacts with the United States are continuous and systematic today, as they have been for years.  MTN is at home in the United States, and in this District.

## DETAILED FACTUAL ALLEGATIONS

### MTN Loses to Turkcell in the Official License Bid

55.     In early 2003, the Iranian government undertook an international tender for the country's first private Global System for Mobile Communications ("GSM") license (the "License").   The only other mobile operator in Iran at that time was the state-owned Telecommunications Company.   Iran's private License offering effort aimed to attract international telecommunications companies to expand Iran's mobile phone service beyond the country's then-3.4 million mobile phone subscribers to an estimated 16 million users over the following 15 years.

56.     In addition to providing the GSM License, Iran committed that the winner of the tender would be allowed to establish and operate a cellular network in Iran, worth a projected $31.6 billion in revenues over 15 years, for a license fee of €300 million ($380 million).   The License holder and the state-owned Telecommunications Company of Iran were to enjoy exclusive use of the market for two years before a third competing license could be awarded.

57.     The Iranian government required each bidder in the tender process to submit a business plan presenting revenue forecasts and a financial plan outlining the percentage of revenues allocated.

58.     Pre-qualification documents were due by December 15, 2003, and Iran qualified both Turkcell and MTN, among others, to submit bids.

59.     Five full offers made the final February 9, 2004 deadline, including Austria's Mobilkom, Egypt's Orascom Telecom, and a Kuwaiti/UK joint venture made up of MTC-Vodafone, Turkcell, and MTN.

60.     On February 18, 2004, the Iranian government announced that Turkcell (through its Irancell Consortium) had won the bid; MTN Group had come in second.  True and correct translations of two notices of Irancell's winning bid from the Ministry of Communication & Information Technology dated February 21 and 22, 2004, respectively, are attached hereto and incorporated by reference as <u>Exhibit C</u>.  The Turkcell investment was reported as the biggest foreign investment deal to occur in Iran since the 1979 Islamic Revolution.

61.     Following its winning the tender, Turkcell had to complete several contractual agreements with the Iranian government and clear certain regulatory requirements.  Turkcell diligently met its obligations; however, at each and every stage, Turkcell found itself prevented from entering the agreements, clearing the regulatory requirements, and completing post-award obligations to obtain the License.  Only in 2011 did Turkcell learn the reason why – because MTN had undertaken unprecedented corrupt acts, up to and including the trading of nuclear votes, promises of arms sales, and payments of bribes, to destroy Turkcell's lawful award of the GSM License and to shift the License to MTN.

## MTN Develops the Plot to "Snooker" Turkcell

62.     As soon as the tender results were announced in Turkcell's favor in February 2004, MTN assessed its loss to Turkcell and decided to continue exploring entry into the Iranian cellular market.  The Iranian market represented the largest single investment and expansion opportunity available to MTN at a critical time in its own corporate history.

63.     To launch its efforts, in March 2004, MTN's Commercial Director Irene Charnley traveled to Tehran and met with Javid Ghorbanoghli, the Iranian Deputy Minister of Foreign Affairs for the Africa Bureau and former Iranian Ambassador to South Africa.  Minister

Ghorbanoghli impressed upon MTN that its only chance to beat out Turkcell's License bid that it had won on commercial terms was to display its political connections and use its influence to favor the Iranian government.

64.     Using its relationship with Minister Ghorbanoghli and other Iranian officials, MTN began an intelligence gathering project within Iran to determine how it could best use its political connections within the South African and Iranian governments to take over the License or, failing that, to hold the third GSM license within Iran when it was offered.  At a minimum, MTN sought to delay the issuance of the License to Turkcell while it explored its options and strengthened its Iranian political connections.

65.     MTN began establishing itself within Iran.  It reached out to its former proposed partner in Iran, Mr. M.K. Sarraf, who was a former Deputy for the Iranian Ministry of Information and Communications Technology, and to Mr. Mohammed Mokhber,[2] the Deputy President of a major "charitable foundation" controlled by the Supreme Leader of Iran, known as the Bonyad Mostazafan ("the Bonyad"), which is run by former officials of the Iranian Ministry of Defense.  The Bonyad is controlled by the Iran Revolutionary Guard Corps, the Iranian military complex formed by Iran's Supreme Leader Ayatollah Ali Khamenei, which is believed to control approximately one third of the Iranian economy.  Despite its financial independence, the Bonyad is a state actor, accountable directly to and an extension of the Supreme Leader, an integral part of the Iranian Republic.  In 2003, the Bonyad was second only to the state-owned national oil company in Iranian corporate asset holdings.  The Bonyad reports directly to the Supreme Leader and MTN was confident that its relationship with Mr. Mokhber and the Bonyad

---

[2] On October 25, 2010, Mr. Mokhber was listed as a sanctioned individual through E.U. Council Regulation No. 961-2010, Annex VIII.  Since that time, Mr. Mokhber has been subject to E.U. sanctions for being associated with Iran's proliferation of nuclear weapons or related activities.

he controlled provided direct access to the Supreme Leader.  The Bonyad is well known for engaging in "Iran's shadow foreign policy."[3]

66.     Through its inquiries, MTN was introduced to Dr. Ebrahim Mahmoudzadeh,[4] a former Iranian Deputy Minister of Defense and the then-President of the state-owned and controlled armament and defense logistics company, Sairan (also known as "Iran Electronics Industries" or "IEI").[5]  Sairan / IEI are also controlled by the Iran Revolutionary Guard Corps. As President of Sairan, Dr. Mahmoudzadeh reported directly to the Iranian Minister of Defense.

67.     Both the Bonyad and Sairan were the founding shareholders of the Iran Electronic Development Company ("IEDC"), which was, at the time, one of Turkcell's local minority partners in the Irancell Consortium that won the License tender.   Mr. Mokhber and Dr. Mahmoudzadeh conveyed to MTN that they might be willing to work with it rather than Turkcell if MTN could obtain certain defense equipment and provide them with other benefits (including, ultimately, full payment of IEDC's capital share in an MTN partnership and the full License fee). MTN eagerly worked to cater to these desires, with its executives believing they could buy enough political influence to overcome the results of the formal tender process.

---

[3] For a general discussion of the Bonyad's history and role in Iranian government and civil society, see Paul Klebnikov, *Millionaire Mullahs*, FORBES, July 21, 2003, cover story.

[4] Dr. Mahmoudzadeh, along with his company Sairan (Iran Electronics Industries), are also listed on the October 25, 2010 E.U. Council Regulation No. 961-2010, Annex VIII, as persons, entities, or bodies who are subject to E.U. sanctions for being associated with Iran's proliferation of nuclear weapons or related activities.  Sairan was also added to the U.S. Office of Foreign Assets Control's Specially Designated Nationals List on September 17, 2008 pursuant to the U.S. Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. part 544.

[5] Sairan, as well as the Iran Communications Industries ("ICI"), "fall under Iran's military-industrial complex [and] are certainly state-owned and controlled."  Statement by Adam Szubin, OFAC Director, Miami, *as reported by* Jim Loney, Reuters.com, *U.S. Charges Foreigners with Illegal Sales to Iran* (Sept. 17, 2008).

68.     More specifically, MTN through these early discussions learned that the Iranian defense establishment was prepared to unlawfully divert the GSM License from Turkcell to MTN if MTN could deliver on the two most important issues at the time (and today) for Iran: the Iranian nuclear program and the Iranian arms program.  Through its discussions with Iranian defense leadership, MTN learned that the Iranians understood South Africa to play a critical role in both, being able to lead the "non-aligned" nations on nuclear votes in international bodies and having access at the very highest levels to sophisticated armaments manufactured in South Africa and otherwise not available to Iran.  MTN deliberately set up to promise, and provide, solutions to each of these issues to the Iranian government.

69.     As but one example, in early 2004 MTN learned that Sairan was seeking opportunities to procure certain military equipment from South Africa, a purchase that had previously been blocked by the South African Conventional Arms Control Committee.  MTN promptly arranged a meeting in March 2004 with the Vice President of Sairan, Mr. A. Vafaei, to discuss how MTN could assist in procuring the defense items.  Mr. Vafaei expressed specific interest in purchasing radio encryption devices manufactured in South Africa.  MTN expressed an ability to facilitate that purchase.

70.     Also in early 2004, MTN met with individuals at the South African Embassy in Iran.  During these discussions, MTN expressed a strong desire to secure a GSM license in Iran.

71.     MTN viewed Minister Ghorbanoghli as an ally who could pull strings with the defense groups and the Supreme Leader to raise MTN's status as a contender for the License.  It regularly visited Minister Ghorbanoghli at the Ministry of Foreign Affairs to reinforce its political influence.

72.     In March or April 2004, the Iranians decided to test MTN's ability to deliver on its promises of defense products and nuclear votes.  Sairan's Vice President, Mr. Vafaei, requested that MTN arrange a meeting with the South African Ministry of Defense and Denel (Pty) Ltd., the largest manufacturer of defense equipment in South Africa.  As is described below, MTN arranged the meetings and worked to arrange Iran's purchase of military radios and encryption technologies that the South African Conventional Arms Control Committee had previously refused to sell to Iran.

73.     Shortly thereafter, in June or July 2004, Hamad Aref, son of the then-presiding Vice President of Iran, Mohammad Reza Aref, invited MTN to a meeting near the Office of the President.  Mr. Aref informed MTN that Iran was developing its defense force, and it wished to procure pilot display computer chips manufactured in Western Cape Province, South Africa.  Mr. Aref asked whether MTN could assist in procuring the chips, and upon information and belief MTN agreed to do so.

74.     Additionally, upon information and belief, MTN offered the advantage to Sairan that it could provide access by the Iranian Ministry of Defense to MTN's devices once MTN was partnered with an Iranian company and running a private cellular network in Iran.  This access would facilitate installation of eavesdropping technology on MTN devices.

75.     These commitments were not hidden from MTN's leadership, including Chairman Cyril Ramaphosa, CEO Phuthuma Nhleko, COO Sifiso Dabengwa, and Commercial Director Irene Charnley.  MTN Group's Board of Directors received regular reports at the time from its local Iran office on the status of Turkcell's license and MTN's strategies.  These reports contained some, but not all, of the details regarding MTN's activities.  Often, members of MTN's leadership would personally travel to Tehran to engage in meetings with Iranian officials

and direct MTN's efforts in Iran.   As was typical, MTN was cautious to keep its most confidential activities, including its communications with government figures and discussions of defense support, unwritten.

76.     Using its gathered information, MTN created a scheme to displace Turkcell as the License holder by leveraging political tensions in Iran and taking advantage of its political connections within South Africa and Iran.

**MTN Moves Into Iran and Solidifies Its Close
Relationships Within the Iranian and South African Governments**

77.     Having realized it could deliver to Iran on each of the key considerations (nuclear votes and defense articles, as well as bribes), in April 2004, MTN established an official office in Iran.   Irene Charnley, the MTN Group Commercial Director of the Strategic Projects Division who was responsible for MTN's efforts to secure the License, oversaw establishment of the office and the gathering of on-the-ground information.

78.     At the same time it was establishing its Tehran office, MTN recognized in a May 2004 report that Turkcell had met all regulatory requirements and was prepared to finalize the License transfer with Iran.   MTN immediately focused on delaying that transfer.   It called upon its relationships with Sairan, the Bonyad, Minister Ghorbanoghli, and the Iranian Ministry of Information and Communications Technology ("MICT") to help delay, stressing that it was ready on moment's notice to take over Turkcell's role.   MTN also pulled strings within South Africa to receive support for delay.

79.     MTN successfully used its political influence to persuade the MICT to delay issuance of the License to Turkcell by several months.   Minister Ghorbanoghli assisted by raising MTN's profile before the Foreign Minister, the President of Iran, and the Supreme

Leader.  As a result of these actions, all directly caused by MTN, MTN succeeded in delaying the License transfer.  This delay bought MTN the time to aggressively lobby its Iranian friends and show it could bring great benefit to the Iranian Ministry of Defense and the Supreme Leader, as well as provide significant financial incentives to Sairan and the Bonyad.

80.     On May 23, 2004, Yusuf Saloojee, another South African friend of MTN, was appointed as South African Ambassador to Iran.  Before he left for Tehran, MTN met with him in South Africa to brief him about the License situation and MTN's desire to take over the License from Turkcell.  When Ambassador Saloojee arrived in Tehran, MTN continued meeting with him on a regular basis to garner his support.  Ambassador Saloojee began working closely with Minister Ghorbanoghli and the defense officials to back up MTN's indications that it had enough political clout to help Iran on the nuclear and defense equipment issues.

81.     Irene Charnley was key to that political clout.  MTN Group, particularly through Ms. Charnley, maintained several close relationships within the South African government. MTN exploited these relationships to strategically position itself between the Iranian and South African governments.

82.     Ms. Charnley had a close relationship with Mosiuoa Gerard Patrick "Terror" Lekota, the South African Minister of Defense, a relationship that formed while they worked together with the United Democratic Front ("UDF") in South Africa during the 1980s, and maintained for decades through their work for various organizations associated with, or related to, the African National Congress ("ANC").  MTN Chairman Cyril Ramaphosa also enjoyed a close relationship with Minister Lekota given their ANC backgrounds.

83.     Ms. Charnley and Phuthuma Nhleko had close relationships with South African President Thabo Mbeki of the ANC party, who was in office from 1999 through 2008.  Ms.

23

Charnley and President Mbeki originally met in 1993 through his wife Zanele Mbeki, with whom Ms. Charnley was friends.   While working with the Chancellor House (an ANC investment fund), Ms. Charnley had many interactions and cultivated her relationship with President Mbeki.   Presently, Ms. Charnley is Chief Executive Officer of Smile Telecoms Holdings Ltd., a company she formed with the assistance of Zanele Mbeki's investments.

84.   MTN had a close relationship with Ambassador Saloojee, which it significantly cultivated in Iran.   The MTN employee who established MTN's Iran office met with Ambassador Saloojee on a regular basis, often seeing him more than once a week.   They became close friends and often ate dinner at each other's homes.   This relationship was critical to MTN because Ambassador Saloojee had a close relationship with President Mbeki, with whom he could meet often (when he returned home to South Africa) and easily access.   At some point in their younger years, Ambassador Saloojee and President Mbeki had been housemates and had worked together on matters for the ANC.

85.   In late 2004, MTN identified members of the Iranian Parliament that might be able to assist in stalling the License issuance to Turkcell.   MTN through Dr. Mahmoudzadeh, worked to amend the Iranian legislation controlling the License issuance to present an obstacle to Turkcell's entry into the market and allow MTN to take its place.

86.   Throughout 2004 and 2005, MTN regularly met with Turkcell's then-local partners, the Bonyad and Sairan.   Its goal was to entice those entities to support MTN and abandon Turkcell, on the promise that MTN had more to offer than Turkcell.   The Bonyad and Sairan responded exactly as MTN planned:   They not only used political leverage to increase delay and shift Turkcell's regulatory requirements, but also they directly began disengaging from

their relationship with Turkcell.  After mid-2005, the Bonyad and Sairan's involvement with Turkcell was merely a charade along the path to forming its venture with MTN.

87.     By June 24, 2005, MTN's established and growing relationships within the South African and Iranian governments and with Turkcell's Iranian business partners culminated into its desired business goal.  MTN met with Turkcell's partners, Sairan and the Bonyad (together IEDC), and signed two Memoranda of Understanding ("MOUs") memorializing an agreement to form a new Irancell Consortium and oust Turkcell.  MTN's CEO Phuthuma Nhleko signed the MOUs on behalf of MTN and Messrs. Dezfouli and Mokhber signed on behalf of the local Iranian partners.  In the course of forming its partnership with IEDC, MTN received copies of and used for its own business advantage the business plan developed by Turkcell for entry into the Iranian cellular market and partnership with Irancell.


**Arms for the GSM License and MTN's Promises of "The Fish"**

88.     MTN used political and monetary lures to enhance its relationships and leverage its position within Iran.  During 2004 and 2005, through a series of meetings between MTN Group and Dr. Mahmoudzadeh, as well as several government officials, MTN undertook to eliminate Turkcell and take over for itself the License by bribing the Iranian government with promises of nuclear votes, defense equipment, and outright cash payments.

89.     MTN knew that Dr. Mahmoudzadeh, who had a direct connection to the Iranian Ministry of Defense, and Sairan, as a direct stakeholder in the Turkcell / Irancell Consortium, could significantly influence Turkcell's ability to finalize its award of the License.

90.     As noted above, Sairan on behalf of the Defense Ministry was specifically looking to procure military equipment that contained restricted U.S. systems or components and

that otherwise could not lawfully be sold to Iran.  Sairan's ongoing negotiations with the South African government had been frustrated by the South African government's refusal to undertake weapons sales due to U.S. restrictions.

91.     MTN knew that it could reach beyond traditional diplomatic exchanges using its high-level political connections in South Africa.  As part of the scheme, MTN indicated to Sairan, through Dr. Mahmoudzadeh, that it could overcome some of the weapons sales barriers Sairan had been facing.

92.     In mid-2004, responding to Dr. Mahmoudzadeh's request, MTN organized and paid for South African Minister of Defense Lekota to make a weekend trip to Iran.  MTN executives, Mr. Nhleko and Ms. Charnley, accompanied Minister Lekota during the entirety of his trip.  MTN funded the trip.

93.     Ms. Charnley, Mr. Nhleko, Minister Lekota, and Ambassador Saloojee met with members from the Iranian Ministry of Defense, including the Minister of Defense Ali Shamkhani.  Together they promised the Minister of Defense that South Africa would deliver "heaven, earth, and the fish," meaning whatever military equipment he desired.  The entire trip was organized and coordinated by MTN so that they could corruptly induce the Iranian government to eliminate Turkcell from its rightfully won License and replace it as the owner of that GSM opportunity.

94.     "The Fish" became the code term used between MTN and the Iranian Ministry of Defense to mean the military equipment MTN promised it would deliver to Iran.

95.     After Minister Lekota departed Iran, Dr. Mahmoudzadeh drafted a list of specific items which constituted "The Fish".  The Fish included:

A.      Rooivalk helicopters (based on the U.S. Apache helicopter), developed by
Denel (Pty) Ltd.,

B.      frequency hopping military radios enabled to send encrypted messages,

C.      sniper rifles,

D.      G5 howitzers, *i.e.*, South African-developed long-range 155mm projectiles
that included U.S. component parts,

E.      canons,

F.      armored personnel and landmine proof carriers developed in South Africa
by Reutech,

G.      coastal radar systems technology developed by a division of Reutech,

H.      air pilot display computer chips,

I.      a missile development company located off the Ivory Coast, and

J.      other defense technology with U.S. systems or components.

96.      In July 2004, Ms. Charnley met with Ambassador Saloojee in his office.  She told him that MTN had the access within the South African Ministry of Defense necessary to facilitate delivery of these items to the Iranian government.  Ambassador Saloojee relayed the message to his Iranian counterparts that MTN could provide The Fish directly to the Iranian government.

97.      Ambassador Saloojee also had dinner in July 2004 with Dr. Mahmoudzadeh, Iranian Minister of Defense Ali Shamkhani, and MTN representatives Ms. Charnley and Mr. Nhleko.  At that and other dinner parties, they discussed how MTN would facilitate Iran's purchase of The Fish.

98.     The list of desired items was finalized by the Iranians in a confidential August 2004 Memorandum of Understanding between Minister Lekota and the Iranian government.  Dr. Mahmoudzadeh sent that Memorandum of Understanding to Ambassador Saloojee at the South African Embassy in Iran.   Ambassador Saloojee showed a copy of the Memorandum of Understanding to MTN at the Embassy, and MTN was directly aware of the Agreement and its obligations to facilitate the delivery of the weapons listed.

99.     The most desired item on the list was the Rooivalk helicopter.  MTN assured Dr. Mahmoudzadeh that it could access the helicopters, which were produced by Denel (Pty) Ltd., a South African defense equipment manufacturer with which Ms. Charnley boasted influential connections.  Earlier official discussions between the South African and Iranian governments regarding procurement of the Rooivalk helicopters had failed because the South African Conventional Arms Control Committee had rejected sale of the helicopters to Iran.   MTN promised it could deliver the helicopters in return for the License won by Turkcell.

100.     Several months later, on November 16, 2004, Ms. Charnley personally sent a letter via facsimile on behalf of MTN Group to be delivered to Dr. Mahmoudzadeh, copying Ambassador Saloojee, to "facilitate a meeting between Denel (Pty) Ltd and the IHRSC[sic] [the Iran Helicopter Support and Renewal Co.]."  A true and correct copy of this facsimile is attached hereto and incorporated by reference as Exhibit D.

101.     The facsimile also confirmed that Ms. Charnley was "in a meeting with the CEO of Denel, Mr. Victor Moche" to arrange discussions between Denel and the IHSRC.  The IHSRC is the Iranian helicopter manufacturing company that would receive helicopters and/or helicopter technology from Denel to produce helicopters with U.S. Apache technology in Iran.

102.     Also after the meetings between MTN, Dr. Mahmoudzadeh, and Minister Lekota,

MTN CEO Phuthuma Nhleko wrote to Dr. Mahmoudzadeh confirming:

> the matters your[sic] raised relating to national security and
> defence matters between South Africa and the Islamic Republic of
> Iran has been fully accepted by MTN.  To this end we have already
> briefed our Minister Defence on the successful discussions that
> have taken place between MTN and the Iranian shareholders in
> Irancell Company.

A true and correct copy of the draft of this letter is attached hereto and incorporated by reference

as Exhibit E.  This draft letter was finalized and is within the possession of MTN; however, this

draft (and other similar exhibits using draft forms) is germane in reflecting MTN's true intent.

103.     MTN's promises to facilitate delivery of "The Fish" to the Iranian government are

further evidenced by a Letter Agreement dated September 18, 2005, between MTN and its local

Iranian partners, IEDC (Sairan and the Bonyad).   A true and correct copy of this Letter

Agreement is attached hereto and incorporated by reference as Exhibit F.  The Letter Agreement

memorialized MTN's earlier agreement to provide defense support in exchange for Irancell's

support of MTN over Turkcell within the Iranian government.   The agreement was signed by

MTN CEO Phuthuma Nhleko and Dr. Mahmoudzadeh of Sairan.

104.     The September 18, 2005 Letter Agreement states that MTN shall provide the

following:

A.     The majority of the Iranian shareholders' capital share and license fee.

"MTN agrees to pay one-hundred (100) percent of MTN's portion of license fee

and equity and eighty (80) percent of Iranian shareholder's portion of license fee

and equity."  Ex. F ¶ 3.

B.     "[C]ooperation between MTN and Iranian shareholders . . . in the line of

defensive, security and political cooperation.   MTN shall fully support

cooperation regarding the aforementioned issues in South Africa."   Ex. F ¶ 8
(underline added).

105.    A later internal MTN memorandum sent to Mr. Nhleko affirms MTN's promises
to provide "The Fish."   Written on March 25, 2007, the memorandum provides a "BRIEF
RECAP OF HISTORY" recounting the events leading up to MTN's procurement of the License
because at the time the Iranians were strongly pressuring the South African Ministry of Defense
and Ambassador Saloojee to deliver the promised weapons.   The memorandum is candid and
directly implicates MTN as the intermediary that arranged the promised weapons sale:

> It will be recalled that MTN only seriously got back into the
> [License] process after our MOD [Minister of Defense] visited the
> country.
>
> At the time certain undertakings were given by MOD of SA [South
> Africa] to the then MOD of Iran around setting up certain technical
> committees who would commence work on a Memorandum of
> Understanding to be signed at a future date between the
> countries. . . .
>
> You will also recall that during the negotiations in September 2005
> Dr Mahmoudzadeh insisted on you signing that 1 page letter in
> which the two parties committed themselves to mutual co-
> operation on political and defence matters.

Ex. B.

106.    Another internal MTN memorandum around the same period is even more
explicit.   A May 16, 2007, MTN "Top Secret" memorandum from the MTN Teheran office to
Mr. Nhleko again confirmed MTN's defense promises:

> In a recent [2007] meeting with our ambassador [Saloojee] the
> continued issue of the defence co-operation was discussed in
> detail. This is a summary of the meeting:
>
> 1.    He agrees that **a commitment was given by the
> Government of SA through IC [Irene Charnley] from our
> Minister of Defence.** It is not clear what the exact nature and

extent of the commitment was because the message was conveyed in a very cryptic fashion i.e. **the ambassador was only told by IC that our MOD has agreed to give them the "Fish".** This word was developed during a secret off-the record discussion between the ambassador and officials for the local foreign ministry and defence ministry around the entry of MTN into the second operator.

2.     Of course this **initial indication of preparedness around defence co-operation was strengthened with the follow-up visit by our MOD and you [Charnley] were present when mutual commitments were made.**

A true and correct copy of the "Top Secret" memorandum is attached hereto and incorporated by reference as Exhibit G.

107.   The corrupt promise of defense articles – the "Fish" – in exchange for the GSM License was a material factor in the Iranian government's decision to prevent Turkcell during this time period from consummating its winning bid for the License, and it was a key factor in the Iranian government moving the GSM License from Turkcell to MTN.

### MTN Bribes Government Officials to Take Over Turkcell's License

108.   MTN formed and preserved its key inside relationships within the Iranian and South African governments through promises and payments of bribes to sitting government officials and Iranian government agencies.  Without this insider help, MTN could not have succeeded in usurping Turkcell.

*Iranian Deputy Foreign Minister Javid Ghorbanoghli*

109.   MTN Group had a longstanding relationship with Iranian Deputy Minister of Foreign Affairs in the Africa Bureau, Javid Ghorbanoghli, that began no later than the initial

License bid period in 2003 and extended beyond November 2005 when MTN ultimately succeeded in obtaining the License.

110.    Ms. Charnley visited with Minister Ghorbanoghli during the initial bid process in late 2003 or early 2004.  She learned that MTN Group was unlikely to receive the License because Turkcell had underbid MTN, and MTN lacked any serious connections within the Iranian government and business community.

111.    The following year, after MTN established a local office in Iran and began making connections within the Iranian government and business community, Ms. Charnley again worked to build her relationship with Minister Ghorbanoghli.

112.    During a lunch meeting, MTN inquired of Minister Ghorbanoghli what was needed for Turkcell to lose the License and for MTN to secure it.  Minister Ghorbanoghli provided MTN with inside information about the process surrounding issuance of the License, identified Turkcell's weaknesses, and assisted MTN in exploring ways to exploit those weaknesses while strengthening its own position within the Iranian government.

113.    Having realized that Minister Ghorbanoghli would be an invaluable player in leading MTN to success, in or around May 2005, Ms. Charnley flew to Iran and met with him, first at his office and then later that evening for dinner.  During their dinner meeting, Ms. Charnley again discussed MTN's desire to secure the License and take Turkcell out of the picture.

114.    At the dinner, Ms. Charnley made an explicit offer to Minister Ghorbanoghli, on no uncertain terms, that if he helped MTN secure Turkcell's License, "MTN will look after you." Ms. Charnley also told Minister Ghorbanoghli words to the effect that "MTN will not forget

those who helped it." The message conveyed was clear. Ms. Charnley promised a cash bribe in exchange for Minister Ghorbanoghli's influence within the Iranian government.

115. After Ms. Charnley made this promise to Minister Ghorbanoghli, he became a guaranteed open door through which MTN could access the Iranian government. MTN learned many details of where Turkcell stood on the License. MTN was able to use Minister Ghorbanoghli to have the Iranian government replace Turkcell with MTN.

116. Thereafter, MTN met with Minister Ghorbanoghli several times per month for lunch or dinner. Occasionally MTN representatives even visited Minister Ghorbanoghli at his home.

117. After Turkcell was refused the License and the Iranians instead committed to give it to MTN, in September 2005, Minister Ghorbanoghli met with an MTN official near MTN's Iranian office. Upon information and belief, at that meeting, Minister Ghorbanoghli reminded MTN, with words to the effect, "I have done a lot of work, and when you get the License, I hope you don't forget the promise that you have made." MTN assured Minister Ghorbanoghli that it would not forget.


*South African Ambassador to Iran, Yusuf Saloojee*

118. In or around June 2005, Ambassador Saloojee invited MTN executives Charnley and Nhleko over to his home for dinner. The atmosphere was jovial during dinner because MTN was increasingly edging closer to its prized License. It had entered into discussions with IEDC to form a partnership with MTN instead of Turkcell, and discussions were going well.

119. Ms. Charnley and Mr. Nhleko thanked Ambassador Saloojee profusely for his continued assistance with MTN within both the Iranian and South African governments.

Ms. Charnley raised the issue of assistance in exchange for payment. She told Ambassador Saloojee words to the effect that "MTN really looks after those people who helped us in the process." Mr. Nhleko confirmed this. They promised a bribe payment to Ambassador Saloojee, using words to the effect that, "If you ever need anything from MTN, you can count on us."

120.    Ambassador Saloojee was aware that MTN had made a similar promise to Minister Ghorbanoghli for his assistance. He kept in regular contact with Minister Ghorbanoghli because they had become close while Ambassador Saloojee worked at the South African Ministry of Foreign Affairs in the Middle East Bureau where he had helped Minister Ghorbanoghli with personal favors, and even arranged for Minister Ghorbanoghli's children to be educated in South Africa.

121.    MTN understood that Ambassador Saloojee accepted their offer. The Ambassador continued to provide intense assistance to MTN during and after the License takeover.

### Iranian Partners: Sairan and the Bonyad

122.    MTN promised its Iranian partners, Sairan and the Bonyad (together forming IEDC), that MTN would pay for 80 percent of their portion of the license fee. This later became 100 percent when MTN entered into its final agreement to form MTN-Irancell.

123.    Additionally, MTN promised Sairan and the Bonyad, through the IEDC, that MTN would pay its capital expenses in the MTN-Irancell partnership. Both promises were extraordinary commitments, far beyond reasonable commercial arrangements.

124.    In exchange for these promises, the president of Sairan, Dr. Mahmoudzadeh agreed to assist MTN in its efforts to convince the Iranian government that it should receive the

License.   Dr. Mahmoudzadeh was instrumental in turning the Iranian government against Turkcell and securing the Iranian government's cooperation in shifting the License to MTN.

125.    Dr. Mahmoudzadeh had a personal interest in Sairan's success, and he received direct financial benefits from the proposed MTN-Irancell partnership, with all expenses paid by MTN.  Recognizing Dr. Mahmoudzadeh's interest in Sairan, MTN agreed to pay all the up-front costs and promised large future revenue shares to Sairan and the Bonyad in exchange for Dr. Mahmoudzadeh's assistance.  This too was an extraordinary commitment, and was so far beyond reasonable commercial arrangements that constituted a bribe payment.

126.    MTN and Dr. Mahmoudzadeh had several negotiations over the terms of the bribe payments to Sairan.   On July 5, 2005, MTN's Mr. Nhleko sent a formal invitation to Dr. Mahmoudzadeh, as well as Mr. Foruzandeh, President of the Bonyad, to visit MTN in South Africa.  A true and correct copy of a draft of this invitation is attached hereto and incorporated by reference as Exhibit H.  Mr. Nhleko stated in the invitation that he wished to discuss with Dr. Mahmoudzadeh, "[t]he nature and extent of financial assistance that the MTN Group could provide to the Iranian partners in the Second Mobile licence in Iran."

127.    Also in exchange for these funding agreements, the Bonyad, through its Deputy President Mohammed Mokhber, agreed to, and in fact did, exercise improper influence up to and including negotiating with and on behalf of the Supreme Leader in MTN's favor.  MTN needed the Supreme Leader's support to create the necessary political and other obstacles to Turkcell being able to conclude its agreement and obtain the License it had rightfully won in the tender. MTN's direct connection to the Supreme Leader specifically resulted in MTN's gaining of support by senior Iranian government officials in winning the License over from Turkcell in exchange for MTN's defense assistance.

128.    In June 2005, Turkcell announced it was prepared to comply with the revised requirements of the License process and took all such necessary actions to do so.   MTN, concerned that all its work had not resulted in its goal of stealing the License from Turkcell, immediately contacted Dr. Mahmoudzadeh to inquire what had happened and to attempt to intervene in Turkcell's receipt of the License.   Dr. Mahmoudzadeh assured MTN that, so long as MTN complied with its promises (detailed above), it did not need to worry, and that no matter what action Turkcell took, the Iranian authorities would never accept Turkcell's efforts and instead would continue to add requirements until Turkcell was unable to comply so that the License could be awarded to MTN.   Sairan at MTN's request would see to it that this was true.

129.    In September 2005, Dr. Mahmoudzadeh informed MTN that due to his efforts within the Iranian Ministry of Defense and MTN's ability to provide military assistance, Turkcell would no longer be receiving the License.   To avoid the appearance of impropriety, MTN requested that Dr. Mahmoudzadeh provide MTN with an official letter of invitation to join with IEDC to form the new MTN-Irancell partnership that would receive the License.   This request was made by letter dated September 13, 2005.

130.    Turkcell was to have received the License certificate on September 14, 2005, but as MTN had been assured by Dr. Mahmoudzadeh (and due to the work of Minister Ghorbanoghli, among others), it did not.

131.    A few days later, around September 17, 2005, MTN sent a letter to IEDC (via Dr. Mahmoudzadeh and Mr. Mokhber) informing them that a senior executive team from MTN would be flying to Iran to finalize negotiations on the structure of the MTN-Irancell partnership. That letter reiterated MTN Group's willingness to fund the Iranian partners' portion of the investment.   "After agreement on the foundation documents the MTN Group will then be

required to make certain payments in relation to the capitalization of the e[sic] Irancell Company and provide certain guarantees in relation to the licence fee."

132.   The next day, September 18, 2005, MTN Group issued a notice to its Board members regarding "Project Snooker" and MTN Group's decision to officially take up the GSM License.  Ex. A.

## MTN Promises and Delivers a Critical Nuclear Vote at the IAEA

133.   From 2004 and forward, MTN knew that critical to obtaining the GSM License was its ability to assist Iran in the country's resistance to the IAEA's impending referral of Iran's nuclear program to the U.N. Security Council ("UNSC").

134.   By way of background, in August 2002, the IAEA was alerted to two hidden nuclear plants, one that enriched uranium and another that produced plutonium, both key components to constructing atomic bombs.  In response to this information, the IAEA sent inspectors to the nuclear plants.  The Iranian government resisted these inspections.  In response, by 2004 the IAEA began to deliberate on whether to refer the Iranian nuclear program to the United Nations for sanctions.

135.   MTN knew that the South African government played a major role in the IAEA, as a member of the Board of Governors.[6]  During 2004, MTN began using its political connections to reach out to the South African Ambassador to the IAEA, Abdul Minty.  MTN wanted to develop this relationship so that it could guarantee South Africa would not vote in favor of referring Iran to the UNSC.  MTN intended to exchange this guarantee as *quid pro quo* for the GSM License.

---

[6] A chronology of South Africa's participation at the IAEA and at the U.N. Security Council is provided at Appendix B.

136.    Between 2004 and 2008, South Africa voted with the international community and against Iran before the IAEA and the UNSC with only three exceptions – each directly related to the events in this Complaint.  On March 13, 2004, June 18, 2004, September 18, 2004, November 29, 2004, and August 11, 2005, the IAEA adopted resolutions calling on Iran to end its nuclear enrichment program and come into compliance with its obligations to the international community under the Nuclear Non-Proliferation Treaty ("NPT").  Each of these resolutions was adopted by consensus without a vote or with South Africa's affirmative vote in support of the world community against Iranian interests.

137.    Likewise, after the IAEA referred Iran to the UNSC in February 2006, the UNSC voted to impose sanctions in December 2006 and thereafter to continue and enhance sanctions against Iran.  After becoming a non-permanent member of the UNSC in 2007, South Africa continued to vote with the international community in favor of sanctions and against Iran on March 24, 2007, March 3, 2008, and September 27, 2008.

138.    The single hiatus from South Africa's longstanding support of international efforts to curtail Iran's violation of the NPT occurred from late 2005 to early 2006—times critical in MTN's scheme to obtain the second GSM License.  Only on three occasions during the relevant time period – September 2005, November 2005, and February 2006, did South Africa abstain from voting with the world community against Iran's interests.

139.    MTN had been working hard behind the scenes to effect South Africa's change in voting.  In late 2004, Ambassador Minty made an official visit to Iran.  Upon information and belief, during that visit, he had dinner with Ambassador Saloojee and MTN representatives where they discussed MTN's hopes of securing the License.  At that dinner, MTN confirmed the importance of the IAEA referral to the Iranian government and solidified its plan to trade the

IAEA vote for the GSM License.   There was no reason for MTN, a telecommunications company, to be discussing IAEA votes with Ambassador Minty other than as part of the corruption conspiracy.

140.   To further the corruption, on or about July 25, 2005, MTN organized and funded a visit to South Africa by the National Security Advisor and Iranian nuclear negotiation chief, Hassan Rowhani.   Advisor Rowhani was sent by and reported directly to the Supreme Leader of Iran.   He sought a meeting with South African President Thabo Mbeki.   Again, MTN, a publicly traded commercial telecommunications company, had no business interest in Iranian nuclear issues other than its efforts to engage in bribery and trading in influence of Iranian officials to eliminate Turkcell and replace it as the winner of the GSM License.

141.   Initially, MTN attempted to arrange a meeting between Advisor Rowhani and President Mbeki, but the South African President's office would not schedule the meeting.   In response, MTN convinced Advisor Rowhani to travel to South Africa to meet with Ambassador Saloojee, Defense Minister Lekota, and Ms. Charnley.

142.   While MTN worked to arrange Advisor Rowhani's visit, it called upon its South African political connections to convince President Mbeki to meet with Advisor Rowhani. President Mbeki again refused to meet with Advisor Rowhani in any official capacity, but later agreed to the meeting "unofficially" because of his relationships with Ms. Charnley and Ambassador Saloojee.

143.   MTN orchestrated a pretext for President Mbeki to meet Advisor Rowhani while President Mbeki was at his residence in Cape Town.   That pretext was an extravagant dinner with the Premier of Western Cape Province.   MTN paid for Advisor Rowhani to stay at a hotel in

Cape Town, sponsored the large dinner party, and covered all travel logistics, including Ambassador Saloojee's visit to South Africa to accompany Advisor Rowhani.

144.    President Mbeki met at his home with Advisor Rowhani.  Ms. Charnley was present for the meeting.  Consistent with MTN's promises, the President assured Advisor Rowhani that the South African government would support Iran at the IAEA.

145.    On September 24, 2005, the IAEA Board of Governors found that Iran was not in compliance with its Nuclear NPT obligations.  South Africa abstained from the vote of the IAEA Board of Governors declaring Iran in non-compliance with the NPT.  The Board passed a resolution to require Iran to "answer crucial IAEA questions and to make key scientists available for interviews.  It also called on the Islamic Republic to suspend uranium enrichment."[7]

146.    The IAEA scheduled a discussion and vote by the Board of Governors on referral of Iran to the Security Council to take place on November 24, 2005, four days after the date MTN was due to receive the GSM License from the Iranian government.

147.    On November 20, 2005, the date that the License was scheduled to be issued to MTN, Dr. Masoum Fardis of the Ministry of Information and Communications Technology showed the MTN Iran office manager a letter on letterhead of the Iranian Ministry of Foreign Affairs advising that the License would be held until South Africa abstained or voted in Iran's favor during the November 24, 2005 Board of Governors meeting at the IAEA.

148.    Immediately upon learning this information the office manager contacted Ambassador Saloojee.  He emphasized to Ambassador Saloojee that the outcome of South Africa's vote at the IAEA was directly connected to MTN's receipt of the License.  In response,

_____

[7] Michael Alder, United States Institute of Peace, *Iran and the IAEA* (Oct. 11, 2010), *available at* http://iranprimer.usip.org/sites/iranprimer.usip.org/files/Iran%20and%20the %20IAEA.pdf.

the MTN office manager asked Ambassador Saloojee to contact South African Ambassador to the IAEA Abdul Minty, who was at the time in Vienna.

149.    MTN further discussed the situation with Minister Ghorbanoghli, who informed them that a South African vote against Iran at the IAEA would cause major problems for MTN. Minister Ghorbanoghli also informed MTN that concerns ran high within the Iranian government that South Africa would not pull through, in which case MTN would not receive the License. Minister Ghorbanoghli emphasized that Ms. Charnley must speak with President Mbeki to receive assurances of South African support.

150.    Ms. Charnley and Mr. Nhleko were distraught at the news that the License was at risk.  As of November 20, 2005, MTN had invested €300 million in the license fee and spent another €150 million in capital and payments of Sairan and the Bonyad's shares of the project.

151.    Ms. Charnley immediately began contacting her friends in the South African government, including President Mbeki.  She insisted that South Africa must at a minimum abstain from any vote to refer Iran to the Security Council for MTN to receive the License.

152.    On November 24, 2005, the IAEA Board of Governors met to address whether to refer Iran to the Security Council.  South African negotiator Abdul Samad Minty addressed the IAEA Board of Governors regarding the implementation of non-proliferation safeguards in Iran and declared:

> South Africa together with a substantial number of Board Members believes that the resolution [of September 24, 2005] was not the correct course of action to follow. . . .   South Africa continues to believe that the correct course of action remains for the Board to allow for more time that would enable the Agency to

continue with its process to clarify certain issues pertaining to the
Islamic Republic of Iran's peaceful nuclear program.[8]

153.    As MTN had promised Iranian officials, South Africa abstained from the
decision.  As a result, the needed votes were not cast in favor of an immediate referral, and the
IAEA extended Iran's time to show compliance with the NPT.

154.    Three days later, on November 27, 2005, the Iranians released the GSM License
previously won by Turkcell to MTN.

**MTN Pays its Promised Bribes**

155.    After receiving the License, MTN made good on its bribe promises to the Iranian
Defense Ministry, the Bonyad, and to the relevant government officials.

*Payment to Sairan and the Bonyad through IEDC*

156.    As noted above, IEDC was comprised of two entities, Sairan (part of the Iranian
Defense Ministry) and the Bonyad, both of which had deep political relationships within Iranian
leadership, up to and including to the Supreme Leader.  From the outset of its discussions with
MTN, Sairan and the Bonyad made clear that a condition of the License being taken from
Turkcell and given to MTN was that MTN agree to fully fund IEDC's capitalization of MTN-
Irancell.  Both IEDC and MTN fully knew and understood that this payment, which totaled
approximately $88 million USD, would be key to the IEDC partners convincing the Supreme
Leader and other Iranian political leaders within the Parliament, Ministry of Defense, and
Ministry of Information and Communications Technology to create the necessary political and

---

[8] Statement by South Africa's IAEA Governor, Mr. Abdul Samad Minty to the IAEA
Board of Governors (Nov. 24, 2005), *available at*
www.dfa.gov.za/docs/speeches/2005/mint1124.htm.

other obstacles to Turkcell being able to conclude its agreement and obtain the License it had rightfully won in the tender. MTN agreed to pay IEDC's $88 million capital share of MTN-Irancell, knowing that this payment was both commercially unreasonable and an improper payment. Along with the capitalization payments, the IEDC partners (the Bonyad and Sairan) also demanded that MTN pay their share of the $300 million license fee. MTN again agreed to do so.

157.     Between January and November 2005, the IEDC partners on the one hand and MTN on the other worked out an arrangement to capitalize MTN-Irancell using exclusively MTN funding and to pay for the IEDC share of the license fee using MTN funding. The Iranian partners were clear that they were not willing to pay any "interest" on, or put up security for, a "loan." MTN Group management, and specifically Irene Charnley, presented the proposed arrangement to MTN, noting that the improper payments of the Iranian shares would be required if MTN were to secure the License.

158.     MTN's Chief Financial Officer, Rob Nisbet, was shocked at the proposal, and he refused to permit the deal to proceed on such improper and unsecured terms. Mr. Nisbet insisted that a formal loan agreement be negotiated and entered into between the parties. Indeed, upon information and belief, Mr. Nisbet threatened to resign from MTN unless formal loan documents were created.

159.     As a result of these discussions within MTN, on November 15, 2005, MTN Group directed its subsidiary, MTN International (Mauritius) Ltd., to enter into sham "loan" agreements with IEDC and the MTN-Irancell entity, Sherkate Khadamate Ertebati-E-Irancell (the Irancell Telecommunications Services Company ("MTN-Irancell")), formed in August 2005 by Dr. Mahmoudzadeh and Mr. Dezfouli. For the IEDC capitalization costs, the parties agreed that

43

MTN would (1) "loan" U.S. $88.7 million to MTN-Irancell, which in turn would "loan" the same funds to IEDC to provide the Iranian partners with their portion of the initial capitalization requirement who would in turn "loan" the funds back to MTN-Irancell for the capitalization costs; and (2) "loan" MTN-Irancell U.S. $351.9 million for a period of four years at an interest rate of LIBOR plus four percent to finance the initial License fee.

160.   Mr. Nisbet continued to voice severe opposition to the arrangements – upon information and belief because he recognized them as being shams that functioned in the same manner as the original IEDC proposal he had vehemently opposed.   He informed MTN's executive team that the "loans" put MTN at huge risk due to its favoring of the Iranian partners and inability to enforce repayment.   Despite the CFO's opposition, MTN executives forced through the sham "loan agreements" and financed the entire MTN-Irancell transaction.   Upon information and belief, Phuthuma Nhleko issued Mr. Nisbet a formal written warning for opposing the financial terms, especially in front of the Iranian partners, and instructed him to move forward with the transaction.

161.   MTN ultimately made the "loans" through a series of complex "round trip" agreements described above used to shift the funds around between IEDC, MTN-Irancell, and MTN.   MTN recorded these loans on the books of the MTN Group and included them in its public financial statements.   The terms of the loans were used only to place the loans on MTN's books in a manner that hid the fact that the monies were paid as bribes and not true loans.

162.   As of the date of this Complaint, neither of the purported loans have been repaid in any part.   Indeed, as initially reported by MTN Group in its public financial statements, the IEDC "loans" were originally subject to full repayment in December 2008, and the MTN-Irancell capitalization and License "loans," plus capitalized interest, were subject to scheduled

repayment between May 2008 and August 2009.[9]  By the time that the loans were due, MTN-Irancell was highly profitable, having produced approximately $118 million of profit in 2007 and $234 million of profit in 2008.[10]  Yet, notwithstanding the enormous profit achieved by IEDC through its 51% ownership of the business, IEDC – consistent with its original intent and with the "sham" nature of the agreement – did not repay the loans.  Instead, MTN simply voluntarily extended the repayment period for another three years.  This rescheduling was reflected in Note 13 to the 2010 MTN Financial Statements,[11] which showed repayment of three loans due in 2011 and another in 2014, as well as shifting of the debt between MTN-Irancell and IEDC.

163.    Three of the rescheduled loans were due to be repaid in 2011.  Between 2008 and 2011, the MTN-Irancell business continued to be hugely profitable, generating $516 million in profit in 2009, $583 million in 2010, and upon information and belief at least $503 million in 2011.[12]  Yet, notwithstanding the hundreds of millions of dollars of profit that IEDC has reaped from MTN-Irancell operations, the loans remain unpaid consistent with both MTN and IEDC's understanding and expectations in 2005.  To address the receivable on its corporate financial statements, upon information and belief, in March 2011 as one of his last acts as CEO, Mr. Nhleko once again "extended" the terms of the IEDC sham "loans" for several more years.

---

[9] Note 13 to MTN Group 2006 Financial Statement, n.*** and n.****, *available at* www.mtn-investor.com/mtn_ar06/fin_group_notes13.htm.

[10] These figures are U.S. Dollar approximates based upon current World Bank exchange rates from South African Rand to U.S. Dollar and based upon MTN's Annual Financial Reports relating to MTN-Irancell.

[11] Found at www.mtninvestor.com/mtn_ar2010/fin_gr_notes.php.

[12] These figures are U.S. Dollar approximates based upon current World Bank exchange rates from South African Rand to U.S. Dollar.

164.    MTN has always understood that the Iranian partners would not repay the capitalization and License "loans." It has taken no action to enforcement repayment, and instead continued to voluntarily "extend" action. MTN's reflection of the sham loans on its corporate financial statements is untrue – MTN has always known, and knows today, that the payments it made to the IEDC to fund the partners' share of Irancell was an improper inducement to have the Iranians provide MTN, rather than Turkcell, the License.

*Payment to Minister Ghorbanoghli*

165.    In late 2006, as MTN began establishing its cellular network in Iran, Minister Ghorbanoghli approached MTN and asked for his compensation for the assistance he provided MTN in receiving the License.

166.    MTN negotiated a payment with Minister Ghorbanoghli of $400,000 U.S. dollars. To present an appearance of propriety in making the payment, MTN arranged for the payment to be made pursuant to a bogus "consultancy agreement." MTN also required that the payment to Minister Ghorbanoghli be made indirectly to conceal the fact that it was a bribe payment.

167.    The sham consultancy agreement and payment was authorized by Mr. Nhleko on behalf of MTN in a memorandum dated December 11, 2006. The memorandum authorizing finalization of the "consultancy agreements" specifically indicates that the "consultancy" work was already complete, allowing payments to "the consultants that assisted the Company during the run up to and actual negotiating period . . . ." A true and correct copy of the MTN memorandum authorizing the consultancy agreement is attached hereto and incorporated by reference as Exhibit I.

168.    Minister Ghorbanoghli arranged for a friend in the Emirates to receive the funds on his behalf.  When MTN objected to paying an individual, rather than a corporate entity, the Minister requested a colleague, Mousa Abolfazl Hosseinzadeh, who owned a consulting company, Aristo Oil International Services LLC, in Dubai to enter the sham consultancy agreement and receive the payment on his behalf.  Aristo is registered to the Iranians Mr. Hosseinzadeh and Saeed Mohd Baqer Saeed Safiq Darani, and to one Emirati, Abdulla Ahmed Ali Alkhaja.  MTN used the front of the sham Aristo agreement to circumvent any detection of wrongdoing by MTN's auditors and financial controls.

169.    MTN drew up the consultancy agreement, which was signed but not dated by Mr. Hosseinzadeh.  MTN received an "invoice" from Aristo on March 4, 2007 for a payment in U.S. Dollars of $400,000 for "[p]roved[ing] consulting and support services during the period 2005 and 2006 in accordance with the signed agreement between MTN International (Mauritius) Limited and Aristo."  A true and correct copy of the Aristo consultancy agreement and the invoice is attached hereto and incorporated by reference as Exhibit J.  Upon information and belief, another copy of the consultancy agreement was signed by Minister Ghorbanoghli.

170.    The sham consultancy agreement describes the consultant "services" to be effected "from time to time" and "generally described in Annexure 1."  Ex. J ¶ 1.6.  The agreement contains no "Annexure 1" but it does contain "Annexure 'A'" describing the "scope of responsibilities" as "introduce MTNI [MTN-Iran] to key roleplayers, arrange meetings and generally provide support and assistance during the negotiations and conclusion of the necessary agreements that will provide for MTNI's entry into the Iranian Mobile Market."  Ex. J.  The typed year on the undated consultancy agreement is 2006, one year after MTN received the License necessary for "entry into the Iranian Mobile Market."  Ex. J p.11.

171.    The consultancy agreement served no legitimate business purpose, and no valuable performance was provided in accordance with any of the terms of the agreement.   In reality, the agreement was used to funnel money.   MTN executives knew that the money was directed ultimately to Minister Ghorbanoghli in payment of MTN's bribe.

172.    A confidential MTN memorandum to Ms. Charnley confirmed the payment arrangement with Minister Ghorbanoghli:

> I have e-mailed you the agreement for Long J and the money should be paid into the following bank account:
>
> MOUSA ABOLFAZL HOSSEINZADEH
> COMMERCIAL BNAK OF DUBAI
> MAIN BRANCH – DUBAI
> ACCOUNT NUMBER: 100054xxxx [the last four digits of the account have been redacted]
> CHEQUE ACCOUNT
>
> Judging from the SMS I sent through to you this morning Long J is going to need the cash pretty soon and I suspect he is going to start pressing me for a date on which the transfer will take place.

A true and correct copy of the confidential memorandum is attached hereto and incorporated by reference as Exhibit K.

173.    "Long J" was the code word that MTN used internally to refer to Minister Ghorbanoghli.   MTN ultimately completed the payment by transferring the U.S. $400,000 bribe payment to Minister Ghorbanoghli's account via Aristo.

_Payment to Ambassador Saloojee_

174.    In the memorandum discussing the payment to "Long J," reference was also made to a second payment to "our other friend in the country."   Ex. K.   This "other friend" is

Ambassador Saloojee. The memorandum was deliberately drafted to misstate that MTN never suggested paying Ambassador Saloojee any money.

175. The suggestion to pay the "other friend" – also known by the MTN code name "Short J" – was prompted specifically at the request of Ambassador Saloojee.

176. After Minister Ghorbanoghli received his bribe, in or about February 2007, Ambassador Saloojee approached MTN for his payment. He had heard through his friend Ghorbanoghli that MTN was now paying its *quid pro quo*.

177. Ambassador Saloojee explained that he was hoping to purchase a home in South Africa that required the equivalent of $200,000 U.S. dollars. MTN agreed that it owed Ambassador Saloojee the bribe payment.

178. On April 26, 2007, MTN provided the direct payment into a trust account for Ambassador Saloojee.

179. Ambassador Saloojee's property attorneys, Gildenhuys Lessing Malatji, Inc., received the payment into a trust account and proceeded with the property purchase. The property transaction was closed on September 26, 2007, providing Ambassador Saloojee with title to the property, Deed No. T66722/2007. On May 25, 2008, Ambassador Saloojee provided his attorneys with signed confirmation of receipt of the property deed. A true and correct copy of the signed confirmation is attached hereto and incorporated by reference as <u>Exhibit L</u>.

180. Unlike the sham Aristo consultancy agreement with Ambassador Ghorbanoghli, MTN never finalized a written contract with Ambassador Saloojee. In a memorandum dated November 10, 2007, MTN noted that it did not finalize its contract with "Short John," "preferring to wait until December of this year to do an agreement that will be done in light of

the actual delivery over the year."   A true and correct copy of this memorandum is attached hereto and incorporated by reference as <u>Exhibit M</u>.

181.    That memorandum also reiterates Ambassador Saloojee's efforts to provide MTN with assistance in exchange for the bribe money he received.   "[Ambassador Saloojee] has come to the party on every occasion that I called upon him.   The fact that the quid pro quo that has threatened at one stage to be the primary stick with which we could be hit [the Iranian government's upset at not having received full defense cooperation as promised by MTN] has now largely disappeared . . . because of his efforts."   Ex. M.


**2006 and Beyond: Iran Attempts to Collect on the MTN Inducements**

182.    Internal MTN Group documents exhibit the bribes it extended to Iranian officials in exchange for receiving the License in November 2005.

183.    After receiving the License, MTN continued to work on fulfilling its defense cooperation deal and continued to engage in discussions with Sairan about delivering military equipment.   During 2005 and 2006, the Iranians specifically asked MTN to assist in procuring Unmanned Aerial Vehicles, or UAVs.   Calling upon Ms. Charnley's relationship with Denel, MTN explored options and prospects for the Iranians.   MTN's files contain at least one report detailing Irene Charnley's work with Denel and its Massachusetts-based subsidiary, Kentron, which produces a Seeker UAV for "long term surveillance and patrol."   It also describes the features and details of UAVs from two other manufacturers that MTN was investigating on behalf of Sairan.   A true and correct copy of this MTN UAV report is attached hereto and incorporated by reference as <u>Exhibit N</u>.

184.    By December 2006, however, MTN had failed to keep its promise to deliver military equipment, and its Iranian partners were growing increasingly demanding that MTN fulfill its commitments.   Beginning in this period, MTN officials began corresponding among themselves about the increasing Iranian demands.   For example, in an MTN Board presentation report made in December 2006, MTN recaps the history of the MTN-Irancell transaction in a timeline showing (1) Turkcell's win of the License bid in February 2004, (2) the MTN Group Board approval to establish an Iran office in August 2004, (3) MTN's efforts in 2005 to enter Irancell, and (4) the award of the License to MTN in November 2005.   At the bottom of the timeline, the presentation states in bold, red lettering, "**The defining characteristic of this transaction was the political forces that were marshalled** [sic] **in support of MTN and it can therefore be concluded on an unequivocal basis that MTN's entry into the Islamic Republic of Iran was at its core due to political decisions taken at the highest levels in Iran.**"   A true and correct copy of excerpts from this report is attached hereto and incorporated by reference as Exhibit O.

185.    In March 2007, MTN began facing even greater pressure from its Iranian partners to deliver on some of its defense- and nuclear-related promises.   In a March 25, 2007 memorandum, MTN reports that it was visited in Iran by a senior Iranian government official who reminded MTN that it had facilitated the President of South Africa's commitments to "**certain defence related promises [that] were made by the South African Minister of Defence (SAMOD) in 2004 in exchange for which MTN was allowed to replace Turkcell in the Irancell consortium.**"   Ex. B at 1 (emphasis added).   This remarkably candid admission of the "arms for license" deal clearly confirms the events of 2004-2005.

186.    That MTN memorandum continues on to report a 2007 visit to South Africa by a senior official in the Iranian Minister of Foreign Affairs regarding the promised arms.   During that meeting, an Iranian Foreign Ministry official "indicated that he has been tasked by his President to get a direct answer from POSA [the President of South Africa] on the defence related matters.   He re-iterated their understanding that **MTN was allowed to replace Turkcell in exchange for defence co-operation**."   *Id*. at 2 (emphasis added).   Prior to visiting South Africa, the Iranian Foreign Ministry official met with Ambassador Saloojee and advised him that he "and **the current President did not agree with the removal of Turkcell from the Irancell consortium but they were finally convinced by the office of the Supreme Leader that there are significant defence benefits in it for the country were MTN allowed into the process**. On that basis they withdrew their objections and allowed the process to proceed in MTN's favor."   *Id*. (emphasis added).

187.    The March 25, 2007 MTN memorandum also recaps MTN's intervention with South Africa during the IAEA vote in November 2005.   The memorandum notes that the Iranians became upset at South Africa's "dramatic U turn" in voting against Iran during a 2007 vote at the U.N. Security Council.   MTN's memorandum indicated its continued close monitoring of South Africa's votes regarding Iran's nuclear development and U.N. sanctions.   *Id*. at 2-3.

188.    MTN recapped the process in 2004 and 2005 that led to its "seriously [getting] back into the [License] process," which occurred only "after our MOD [Minister of Defense] visited the country."   *Id*. at 3.   That "RECAP OF HISTORY" recalls the MTN negotiations in September 2005 in which "Dr Mahmoudzadeh insisted on you [Phuthuma Nhleko] signing that 1 page letter in which the two parties committed themselves to mutual co-operation on political

and defence matters." *Id*.  In other words, the Iranian government only turned over the License in exchange for promises of "The Fish."

189.    The March 2007 memorandum concludes that, "It would seem clear that the issue of defence co-operation has become a pressing matter within the government of Iran." *Id*.  MTN staff advised MTN leadership that, "Given the clear linkage that the Government of Iran has drawn between the defence assistance and allowing MTN into the country the likelihood that there will be serious blowback for MTN is increasing." *Id*.  On the recommendation of MTN's paid-for confidant and political advisor, Ambassador Saloojee, Phuthuma Nhleko was urged "to contact POSA [President of South Africa] and impress upon him that the failure to resolve the defence matters to the satisfaction of Iran will have severe negative repercussions for MTN." *Id*. at 4.

190.    MTN also found itself threatened in late 2007 by a "renewed approach by Long John" (Iranian Deputy Foreign Minister Ghorbanoghli).  Minister Ghorbanoghli sent cellular SMS messages to MTN with further requests to MTN.  An internal MTN memorandum noted, "[w]hatever his motivations, [Minister Ghorbanoghli's requests are] not something that should be ignored.  While he has very little power to do anything positive [at this point], he can be a destructive force or simply an unnecessary distraction." Ex. M at 2.

191.    These and other MTN documents directly reveal the extreme length that MTN went to in wedging itself into the deepest of Iranian political affairs to win over the License at all costs.

**Summary**

192.    MTN attempted, but failed, to properly win the right to the Iranian GSM License through participation in the Iranian international tender.  Having failed to lawfully win the License, MTN then proceeded to undertake a series of unlawful acts to steal the License from Turkcell.

193.    MTN, knowing that Iran was highly concerned about international support for its nuclear program and that Iran was desperate for the acquisition of arms to evade international and American sanctions, embarked on a deliberate scheme of corruption and bribery to have the Iranian government block Turkcell's efforts to secure what it had won in the tender, and to have the Iranian government switch the License award from Turkcell to MTN.

194.    In the course of its scheme, MTN traded in political influence to arrange the exchange of a South African vote at the IAEA for the GSM License; promised to deliver "The Fish" – a code name for a list of arms – to Iran; directly bribed multiple Iranian and South African officials, including the Deputy Foreign Minister of Iran and the South African Ambassador to Iran; and issued sham loans to its local state defense-related Iranian partners.

195.    As a direct result of MTN's illegal actions, Turkcell was prohibited from securing the GSM License it had won, and the Iranians gave that License to MTN instead.


**CLAIMS FOR RELIEF**

**COUNT I**
Alien Tort Statute, 28 U.S.C. § 1350,
Violation of the Law of Nations Prohibiting
Corruption through Bribery and Trading in Influence

196.    Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

197.    MTN has engaged in deliberate acts in violation of the law of nations prohibiting corruption through bribery and trading in influence, through which it intentionally caused severe financial harm to Turkcell.  These acts include:

A.    Bribery and trading in influence of Iranian government officials by promising to assist in the purchase and trafficking of illicit military equipment and technology from South Africa to the Iranian government;

B.    Bribery and corruption by promising and making payments to Minister Ghorbanoghli in exchange for his efforts to thwart Turkcell's application for the GSM License and to enable MTN to receive the License;

C.    Bribery and corruption by promising and making payments to Ambassador Saloojee in exchange for his engagement in diplomatic relations designed to enable MTN to receive the License;

D.    Bribery and trading in influence by promising and paying for all expenses of the government-owned defense procurement company, Sairan, and the Bonyad, with its direct connections to the Supreme Leader, to participate in the MTN-Irancell partnership, in exchange for their assistance within the Iranian Ministry of Defense and with the Supreme Leader to enable MTN to receive the License; and

E.    Manipulation of the South African government to ensure it abstained at the IAEA from voting to refer Iran to the U.N. Security Council.

198.    These acts violate the law of nations prohibiting legal persons from engaging in bribery and trading in influence, as well as prohibitions on illicit trafficking of defense equipment and nuclear proliferation, including but not limited to customary international law;

treaties, conventions, and agreements between nations; and other universal prohibitions on corruption as stated by the following:

A.      United Nations Convention Against Corruption, G.A. Res. 58/4, U.N. Doc. A/RES/58/4 (Oct. 31, 2003);

B.      African Union Convention on Preventing and Combating Corruption, July 11, 2003, 43 I.L.M. 5 (2004);

C.      Southern African Development Community, Protocol Against Corruption, (Aug. 14, 2001);

D.      Organisation for Economic Co-operation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, Nov. 21, 1997, S. Treaty Doc. No. 105-43, 37 I.L.M. 1 (1998);

E.      Organization of American States, Inter-American Convention against Corruption, Mar. 29, 1996, S. Treaty Doc. No. 105-39, O.A.S.T.S. No. B-58, 35 I.L.M. 724 (1996);

F.      Council of Europe, Civil Law Convention on Corruption, Nov. 4, 1999, EUROP. T.S. No. 174;

G.      Council of Europe, Criminal Law Convention on Corruption, Jan. 29, 1999, EUROP. T.S. No. 173;

H.      Council of Europe, Committee of Ministers General Resolution (99) 5, App'x (May 1, 1999) ("Statute of the Group of States Against Corruption");

I.      Asian Development Bank and Organisation for Economic Co-operation and Development Anti-Corruption Action Plan for Asia and the Pacific (Nov. 30, 2001);

J.      World Bank Group, Strategy on Strengthening World Bank Group Engagement on Governance and Anticorruption (March 21, 2007);

K.      United Nations Global Compact, Global Compact Principle 10 (June 24, 2004);

L.      United Nations Convention against Transnational Organized Crime, G.A. Res. 55/25, Annex II, U.N. Doc. A/RES/55/25 (Nov. 15, 2000);

M.      United Nations Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their Parts and Components and Ammunition, Supplementing the United Nations Convention against Transnational Organized Crime, G.A. Res. 55/225, U.N. Doc. A/RES/55/255 (June 8, 2001);

N.      Treaty on the Non-Proliferation of Nuclear Weapons, July 1, 1968, 21 U.S.T. 483, 729 U.N.T.S. 161;

O.      Agreement Concerning the Provision of Training under the United States International Military Education and Training (IMET) Program, July 11, 1994, KAV 3947, Temp. State Dept. No. 94-187;

P.      Agreement Regarding Grants under the Foreign Assistance Act of 1961, as amended, and the Furnishing of Defense Articles, Related Training and Other Defense Services from the United States to South Africa, Oct. 24, 1995, KAV 4470, Temp. State Dept. No. 95-239; and

Q.      Agreement Concerning Cooperation on Defense and Trade Controls, Jan. 24, 1997, TIAS 12,825.

199.    In addition, bribery of foreign and domestic officials is unlawful in South Africa under the Prevention and Combating of Corrupt Activities Act (No. 12 of 2004).  The United

States' Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1, et seq., also forbids the making of offers, payments, or promises to pay "anything of value" to a foreign official to corruptly influence the official to give business or to obtain an improper advantage in securing or retaining business. Upon information and belief, Iran has a similar domestic law, in that Iran ratified the Convention against Corruption in April 2009.

200. Corruption through bribery and trading in influence has been considered historically and by a consensus of international legal scholars and corporate stakeholders to be unethical and in violation of the law of nations.

201. The act of bribery is specifically defined in the various instruments identified in paragraph 198 of this Complaint. For example, the U.N. Convention against Corruption defines "bribery" as:

> (a) The promise, offering or giving, to a public official, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties;

> (b) The solicitation or acceptance by a public official, directly or indirectly, of an undue advantage, for the official himself or herself or another person or entity, in order that the official act or refrain from acting in the exercise of his or her official duties.

U.N. Convention against Corruption, Art. 15 (referring to bribery of national public officials). Similar language appears in the U.N. Convention against Corruption prohibiting bribery of foreign officials and officials of public international organizations. These Conventions explicitly apply to corporate actors (or "legal persons") as well as individuals.

202. The act of trading in influence is specifically defined in the various instruments identified in paragraph 198 of this Complaint. For example, the U.N. Convention against Corruption defines "trading in influence" as:

(a) The promise, offering or giving to a public official or any other person, directly or indirectly, of an undue advantage in order that the public official or the person abuse his or her real or supposed influence with a view to obtaining from an administration or public authority of the State Party an undue advantage for the original instigator of the act or for any other person;

(b) The solicitation or acceptance by a public official or any other person, directly or indirectly, of an undue advantage for himself or herself or for another person in order that the public official or the person abuse his or her real or supposed influence with a view to obtaining from an administration or public authority of the State Party an undue advantage.

U.N. Convention against Corruption, Art. 18. The prohibitions on trading in influence also apply explicitly to corporate actors.

203. MTN's deliberate acts violate the specific, obligatory, and universal prohibition against the corrupt acts of bribery and trading in influence by legal persons. As a direct result of these acts, Turkcell suffered extensive damages exceeding $4.2 billion.

204. MTN acted fraudulently, with ill will, recklessly, wantonly, oppressively, in willful disregard of Turkcell's rights, and in a manner tending to aggravate Turkcell's injury. Punitive damages should, therefore, be awarded to Turkcell reflecting the egregiousness of MTN's actions.

205. MTN Group, through the direct commands and participation of its executives, orchestrated the entire scheme to make illicit promises and payments and to tortiously interfere with Turkcell's receipt of the GSM License. MTN Group, therefore, is jointly and severally liable for the damage caused to Turkcell by its acts and by the acts of its subsidiaries, directors, and agents.

**COUNT II**

Aiding and Abetting in Violation of Treaties of the United States

206. Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

207. The Iranian and South African government participation in bribery, trading in influence, attempts to procure illicit arms, and trading in the IAEA vote orchestrated by MTN as described in this Complaint violates international covenants and treaties of the United States, including:

A. United Nations Convention Against Corruption, G.A. Res. 58/4, U.N. Doc. A/RES/58/4 (Oct. 31, 2003);

B. African Union Convention on Preventing and Combating Corruption, July 11, 2003, 43 I.L.M. 5 (2004);

C. Southern African Development Community, Protocol Against Corruption, (Aug. 14, 2001);

D. United Nations Convention against Transnational Organized Crime, G.A. Res. 55/25, Annex II, U.N. Doc. A/RES/55/25 (Nov. 15, 2000);

E. United Nations Protocol against the Illicit Manufacturing of and Trafficking in Firearms, Their Parts and Components and Ammunition, Supplementing the United Nations Convention against Transnational Organized Crime, G.A. Res. 55/225, U.N. Doc. A/RES/55/255 (June 8, 2001);

F. Treaty on the Non-Proliferation of Nuclear Weapons, July 1, 1968, 21 U.S.T. 483, 729 U.N.T.S. 161;

G.      Agreement Concerning the Provision of Training under the United States International Military Education and Training (IMET) Program, July 11, 1994, KAV 3947, Temp. State Dept. No. 94-187;

H.      Agreement Regarding Grants under the Foreign Assistance Act of 1961, as amended, and the Furnishing of Defense Articles, Related Training and Other Defense Services from the United States to South Africa, Oct. 24, 1995, KAV 4470, Temp. State Dept. No. 95-239; and

I.      Agreement Concerning Cooperation on Defense and Trade Controls, Jan. 24, 1997, TIAS 12,825.

208.    MTN's premeditated actions aided and abetted in the state violations of these treaties and covenants of the United States.

209.    MTN's deliberate actions caused severe financial harm to Turkcell.

210.    As a direct result of these acts, Turkcell suffered extensive damages exceeding $4.2 billion.

211.    MTN acted fraudulently, with ill will, recklessly, wantonly, oppressively, in willful disregard of Turkcell's rights, and in a manner tending to aggravate Turkcell's injury. Punitive damages should, therefore, be awarded to Turkcell reflecting the egregiousness of MTN's actions.

212.    MTN Group, through the direct commands and participation of its executives, orchestrated the entire scheme to make illicit promises and payments and to tortiously interfere with Turkcell's receipt of the GSM License.  MTN Group, therefore, is jointly and severally liable for the damage caused to Turkcell by its acts and by the acts of its subsidiaries, directors, and agents.

## COUNT III
Tortious Interference with Contractual or Other Business Relationships

213.     Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

214.     In response to the Iranian government's 2003 request for bids on the country's first private GSM License—a License for fifteen years with renewal options, potentially worth tens of billions of dollars—Turkcell, via the East Asian Consortium, submitted a bid.

215.     In February 2004, Turkcell won the bid, establishing a valid contractual and business relationship between it and the Iranian government.

216.     MTN had also submitted a bid, which was unsuccessful.

217.     MTN knew that Turkcell ultimately won the bid.

218.     After Turkcell won the bid, MTN engaged in a plot to interfere with Turkcell's contractual and business relationship.

219.     MTN was successful.  It obtained the GSM License.

220.     As a direct result, Turkcell has suffered extensive damages in excess of $4.2 billion.

221.     MTN acted fraudulently, with ill will, recklessly, wantonly, oppressively, in willful disregard of Turkcell's rights, and in a manner tending to aggravate Turkcell's injury. Punitive damages should, therefore, be awarded to Turkcell reflecting the egregiousness of MTN's actions.

**COUNT IV**
Conversion

222.    Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

223.    In response to the Iranian government's 2003 request for bids on the country's first private GSM License—a License for fifteen years with renewal options, potentially worth tens of billions of dollars—Turkcell, via the East Asian Consortium, submitted a successful bid.

224.    In February 2004, Turkcell won the bid, establishing a valid contractual and business relationship between it and the Iranian government.

225.    MTN had also submitted a bid, but that bid was unsuccessful.  MTN knew that Turkcell had won the bid.

226.    After Turkcell won the bid, MTN engaged in acts that resulted in the conversion of Turkcell's property rights in the GSM License.

227.    MTN convinced Turkcell's Iranian business partners to provide it with a copy of Turkcell's business plan, which it then used for its own business advantage in convincing Turkcell's business partners to join with MTN rather than Turkcell.  It also used Turkcell's business plan as the platform for its entry into the Iranian cell phone industry.

228.    MTN was successful.  Using unscrupulous means, including the stolen business plan, MTN ultimately obtained the GSM License.

229.    As a direct result, Turkcell has suffered extensive damages in excess of $4.2 billion.

230.    MTN acted fraudulently, with ill will, recklessly, wantonly, oppressively, in willful disregard of Turkcell's rights, and in a manner tending to aggravate Turkcell's injury.

Punitive damages should, therefore, be awarded to Turkcell reflecting the egregiousness of MTN's actions.

## COUNT V
### Tortious Interference with Prospective Contractual Advantage

231.    Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

232.    In response to the Iranian government's 2003 request for bids on the country's first private GSM License—a License for fifteen years with renewal options, potentially worth tens of billions of dollars—Turkcell, via the East Asian Consortium, submitted a successful bid. The success of Turkcell's bid created a prospective economic advantage in the ownership and operation for 15 or more years of the leading cellular telephone network in Iran.

233.    MTN had also submitted a bid, but lost the tender.

234.    Having failed to obtain a right to the License lawfully, MTN proceeded to capture the License unlawfully.  In doing so, MTN interfered with and denied Turkcell's prospective economic advantage.

235.    As a direct result, Turkcell has suffered extensive damages in excess of $4.2 billion.

236.    MTN acted fraudulently, with ill will, recklessly, wantonly, oppressively, in willful disregard of Turkcell's rights, and in a manner tending to aggravate Turkcell's injury. Punitive damages should, therefore, be awarded to Turkcell reflecting the egregiousness of MTN's actions.

## COUNT VI
<u>Civil Conspiracy</u>

237.     Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

238.     MTN worked in agreement with members of the Iranian and South African governments with the intent to injure Turkcell by usurping its lawful right to the GSM License.

239.     Various agreements existed between MTN and members of the Iranian and South African governments by verbal and written statements and by implication of the direct conduct of the parties.

240.     In response to the Iranian government's 2003 request for bids on the country's first private GSM License—a License for fifteen years with renewal options, potentially worth tens of billions of dollars—Turkcell, via the East Asian Consortium, submitted a successful bid. The success of Turkcell's bid created a prospective economic advantage in the ownership and operation for 15 or more years of the leading cellular telephone network in Iran.

241.     MTN had also submitted a bid, but lost the tender.

242.     Having failed to obtain a right to the License lawfully, MTN proceeded to capture the License unlawfully in conspiracy with Iranian and South African government officials and business persons.  In doing so, MTN participated in civil conspiracy to commit unlawful acts.

243.     As a direct result, Turkcell has suffered extensive damages in excess of $4.2 billion.

244.     MTN acted fraudulently, with ill will, recklessly, wantonly, oppressively, in willful disregard of Turkcell's rights, and in a manner tending to aggravate Turkcell's injury. Punitive damages should, therefore, be awarded to Turkcell reflecting the egregiousness of MTN's actions.

## COUNT VII
### Breach of Contract

245.     Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

246.     The parties entered into a mutual Confidentiality and Non-Disclosure Agreement ("Confidentiality Agreement") dated January 23, 2012, the stated purpose of which was to exchange Confidential Information (as defined in the Confidentiality Agreement ¶ 1) to facilitate the parties' engagement in confidential settlement discussions.

247.     The Confidentiality Agreement was executed in the District of Columbia by MTN Group Limited's counsel in Washington, D.C., Freshfields Bruckhaus Deringer US LLP, with an address at 701 Pennsylvania Avenue NW, Washington, D.C., 20004.

248.     The Confidentiality Agreement defined "Confidential Information" to include "all documents (including draft pleadings and exhibits), correspondence, and communications, including all information or legal theories contained within such documents, correspondence, and communications, disclosed by either Party to the other Party pursuant to this Agreement . . . ."

249.     Under the terms of the Confidentiality Agreement, the parties entered into confidential settlement discussions and exchanged Confidential Information, including Turkcell's draft complaint and identification of legal claims.  This exchange of Confidential Information occurred, among other places, in Washington, D.C.

250.     All subsequent communications from Turkcell to MTN were made confidentially through Washington, D.C. counsel (both Freshfields and Mr. Lanny Davis, who upon information and belief was retained by Freshfields on behalf of MTN) and under the terms of the Confidentiality Agreement.  This included discussions of Turkcell's draft complaint, legal

claims, evidence, and MTN's so-called "independent investigation" (a/k/a the Hoffmann Committee).

251.     On March 12, 2012, MTN issued a public press release accusing Turkcell of making an "extortionate litigation threat" and of refusing to cooperate with MTN's independent investigation into Turkcell's claims.  A true and correct copy of this press release is attached hereto and incorporated by reference herein at Exhibit P.

252.     MTN's press release was disseminated to, and published by,  U.S. media outlets, including Reuters, Bloomberg, Market Watch, PR Newswire, and the Wall Street Journal, among others.

253.     MTN's press release revealed legal theories that Turkcell provided to MTN under the terms of the Confidentiality Agreement by commenting that Turkcell's claim could be impacted by a pending matter before the U.S. Supreme Court.

254.     MTN's press release argued that Turkcell's claims, which Turkcell had only revealed in detail in its draft complaint provided under the Confidentiality Agreement, lacked legal merit and a basis for a U.S. court's consideration.

255.     MTN's press release complained that Turkcell had refused to cooperate with MTN's independent "Hoffman Committee" investigation into Turkcell's allegations.  Any communications regarding the Hoffmann Committee occurred only in the course of the confidential settlement negotiations, and any statements by MTN regarding the Turkcell's position regarding the Hoffmann Committee were a direct breach of MTN's obligations under the Confidentiality Agreement.  Further, MTN's statements were false.

256.     Prior to MTN's March 12, 2012 press release, it was not publicly known that (1) Turkcell's claims related to any matters pending before the U.S. Supreme Court; (2) MTN and

Turkcell had discussed the Hoffman Committee; or (3) Turkcell had made damages demands on MTN.

257.   MTN's March 12, 2012 press release materially violated the terms of the Confidentiality Agreement.

258.   MTN's breach has caused Turkcell damages, including impacting its traded share price, in an amount to be proven at trial but no less than $50 million.

## COUNT VIII
## Defamation *Per Se*

259.   Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

260.   MTN's March 12, 2012 press release knowingly and intentionally accused Turkcell of making an "extortionate litigation threat" and of refusing to "cooperate with the independent investigation that MTN has set up."

261.   Both of these statements are false.

262.   At the time it issued the press release, MTN knew its accusations of extortion and refusal to cooperate to be false.

263.   MTN's statements are defamatory *per se* in the District of Columbia because they are false criminal charges and directly attack Turkcell's reputation for ethical business practices and honesty.

264.   The press release was published throughout worldwide media distribution channels, including within the United States.   Social media outlets reprinted the extortion falsehood.   Twitter feeds show within two days of the press release, the claim of extortion was republished over 70 times worldwide.

265.   MTN knew, anticipated, foresaw, and intended that its press release would be distributed and read throughout the United States, including in the District of Columbia, and damage Turkcell.  MTN knew, anticipated, foresaw, and intended that its press release would negatively impact Turkcell's stock traded on the New York Stock Exchange and elsewhere.

266.   Defamation *per se* is actionable without proof of special damages.  Regardless, Turkcell has suffered, and continues to suffer, irreparable harm to its reputation as a result of MTN's defamatory statements in an amount to be proven at trial but no less than $100 million.

267.   MTN defamed Turkcell with ill will, recklessly, wantonly, oppressively, in willful disregard of Turkcell's rights, and in a manner tending to aggravate Turkcell's injury.  Punitive damages should, therefore, be awarded to Turkcell reflecting the egregiousness of MTN's actions.

## DEMAND FOR A JURY TRIAL

268.   Plaintiffs demand a jury trial on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and a judgment against all Defendants, jointly and severally, as follows:

A.   entering judgment against Defendants and in favor of Plaintiffs for each count alleged in this Complaint;

B.   declaring, pursuant to 28 U.S.C. § 2201, that Defendants have violated the law of nations prohibiting bribery and trading of influence and the laws of the District of Columbia and the United States, as set forth herein, and that Defendants are liable for

future costs and damages to Plaintiffs resulting from the past tortious and wrongful conduct of Defendants;

      C.      awarding Plaintiffs compensatory damages in an amount to be determined at trial, but of no less than $4.2 billion U.S. dollars, plus interest, and punitive, consequential, and other damages;

      D.      awarding Plaintiffs their costs and reasonable attorneys' fees incurred in this action;

      E.      retaining jurisdiction for the purpose of enabling Plaintiffs to apply to the Court for such further orders and directions as may be necessary or appropriate for the construction or carrying out of any orders made in this action, for the modification of any such orders, for the enforcement of compliance therewith and the punishment of any violations thereof; and

      F.      awarding Plaintiffs all other relief the Court deems just and proper.

Respectfully submitted,

Read K. McCaffrey, Esq. (# 413837)
Kristen M. Jarvis Johnson, Esq. (# 985032)
Rory E. Adams, Esq. (# 986549)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC  20037
Phone:  (202) 457-6000
Fax:  (202) 457-6315
rmccaffrey@pattonboggs.com
kmjohnson@pattonboggs.com
radams@pattonboggs.com

*Counsel for Plaintiffs*

Date:  March 28, 2012

5201568