# EXHIBIT A

# <u>MEMORANDUM</u>

<u>**STRICTLY CONFIDENTIAL**</u>

TO : SIFISO DABENGWA
ROB NISBET
IRENE CHARNLEY

COPY : CHRIS KILOWAN
PAUL NORMAN

FROM : PHUTHUMA NHLEKO

DATE : 21 SEPTEMBER 2005

SUBJECT : **OVERVIEW AND WAY FORWARD – PROJECT SNOOKER**

---

### 1. OPPORTUNITY

Project Snooker still presents one of the most significant "virgin" mobile opportunities in the world.  In the light of this fact and notwithstanding the significant challenges that lie ahead, the MTN Group must continue to pursue this opportunity vigorously.

### 2. CURRENT STATUS

The signing of the various agreements this week [under duress] was to "book our place at the foot of the mountain – we still need to scale it to get to the peak".  It was a choice between inheriting an advanced arrangement [Turkcell revenue share and various negotiated agreements] or taking the chance that the window of opportunity may close on us whilst we try to reconstruct the deal and the arrangements from scratch.  We chose the former.

### 3. RISK AND REWARD

Snooker is "no normal country".  The Ministry of Defence, Government controlled banks and companies, together with Government essentially control all the commercial activity in the country.  Consequently, a conventional mindset, orthodox financial and operational approach to this project is unlikely to provide us with an outcome that I would feel comfortable to recommend to the board on an investment of over €400 million [license fee and working capital] into Snooker.  It is therefore imperative to think

laterally on how we can secure the investment, attain financial and operational control in a manner that allows us to penetrate the market achieving an acceptable IRR and successfully repatriating profits and dividends.

## 4.    TIMING

The expectation is that the license fee should be paid within weeks and the operation launched commercially within a six month period. Notwithstanding this requirement, we cannot recommend that the license fee be paid independently of a signed loan agreement with the local partners together with the transfer of our share certificate, capitalization of the Company and the securing of project finance. **These pre-conditions must be fulfilled contemporaneously** otherwise we seriously run the risk of finding ourselves in an untenable situation.

We are essentially trying to make a commercial venture of an inherited bid (28% revenue share).  Consequently, we need an urgent reassessment of the key assumptions, as well as what can be leveraged [infrastructural and distribution] from our partners with a view of achieving at least the minimum USD IRR that has been set by the board.

The implied time scale can only be achieved through a well thought out and coordinated project management structure up until the operation is "on its feet" and can be passed onto a permanent MD / COO.  There is no point in a uncoordinated team getting on a Plane and rushing to Snooker without clear objectives and agreed program with a critical path and a coordinated structure.  Failure to put these in place will simply generate chaos with the resultant bickering and finger pointing.

## 5.    PROJECT MANAGEMENT

Given the size of the market, limited time to launch and all that has to be reviewed and completed before the MTN Group board ratifies the revised business plan, a special project structure must be put in place.  Project management essentially has two phases.

### 5.1.   Phase I

Phase I is essentially priority work that has to be undertaken thus enabling management to present a revised fundable business plan, together with the financial structuring that would make such an investment possible.  Key elements of Phase I are:

  A.   Operations and "on the ground assessment".

B. Finance and security arrangements, ancillary agreements and legal input (the loan and management agreements are crucial).

C. The overall coordination of A and B above to compile revised business plan.

### 5.1.1 Operation and on ground assessment

The Group COO is to take responsibility for this area by appointing the project director who reports to the Group COO with a clear objective and a comprehensive program. Their responsibility is to take all such steps necessary to enable the operation to launch within a six month period. In Phase 1, the priority is to make an assessment of what can be leveraged as regards systems networks, property etc! So as to refine assumptions in the business plan.

### 5.1.2 Finance Structure, project funding and ancillary loan agreements

The Group CFO should take responsibility for this area, primarily in the following categories:

- Flow of license fee and working capital
- Appropriate security arrangements for funding of local partners together with the loan agreements
- Arranging the project finance

### 5.1.3 Business plan and overall coordination

The overall coordination in Phase I will be the responsibility of the Commercial Director with particular responsibility of ensuring that the outcomes of 5.1.1 and 5.1.2 are incorporated into a revised business plan and recommendation to be approved by MTN Group Exco and then the MTN Group board.

## 5.2 Phase II

Phase II will overlap and run almost concurrently with Phase I on the assumption that an acceptable revised business plan will be approved by the MTN Group board. The essence of Phase II is to ensure that the period leading to commercial launch and immediately thereafter is managed on a special project basis thus ensuring optimum output. To this end, the Group COO and I have agreed a process and structure that is outlined in Annexure I herewith attached.

**6.      PROJECT STEERING COMMITTE**

I will chair a project steering committee that will have the responsibility of meeting regularly to oversee both Phase I and Phase II until the project is passed onto the MD / COO.  The Steering Committee shall comprise of:
CEO
COO
CFO
CTO
Commercial Director
Group Executive HR


**7.      HR RESOURCES**

The Group COO, Group HR executive and I will liaise to review various resources in the Group to ensure that the temporary appointments to staff the structure shown in Annexure 1 utilizes the capacities within the Group, ensuring a smooth movement of people and resources.

**8.      CONCLUSION**

This is one of the most significant opportunities the Group will undertake and will require teamwork to achieve these objectives.

**9.      IMMEDIATE WAY FORWARD**

Commercial director to liaise with CFO, COO and CEO to formulate a coordinated program with critical path ensuring that Phase I is completed timeously giving due regard to the sequence of events both financial and operational and the overlap with Phase II.

CEO to send letter to partners in Snooker advising them of program and activities so that we are all on "same page" on what is to transpire over the next few weeks.


**PHUTHUMA F. NHLEKO**
**GROUP CHIEF EXECUTIVE**

# EXHIBIT B

**MTN GROUP LIMITED**

# Memorandum — HIGHLY CONFIDENTIAL



**To:**      Phuthuma Nhleko

**From:**   Chris Kilowan

**Date:**   25 March 2007

**Re:**      Ambassador Briefing: Larijani, Mottaki and MTN

---

Ambassador Saloojee gave me a briefing earlier today on the recent visits to South Africa of Mr Larijani (Secretary Of the Supreme National Security Council –SNSC-) and Minister Motakki (Minister of Foreign Affairs - MOFA).

**VISIT OF MR LARIJANI**

Mr Larijani was sent by the Supreme Leader to deal with two issues:

1.   The ongoing dispute around Iran's nuclear programme, the upcoming vote on further sanctions as a result of Iran's refusal to suspend its nuclear activities and South Africa's approach to this matter as the revolving chairman of the UN Security Council (UNSC).

   On this issue there was largely agreement on how South Africa would approach the matter and its subsequent performance at the UNSC was largely in line with the undertakings given by South Africa.

2.   Reminding the President of South Africa (POSA) that certain defence related promises were made by the South African Minister of Defence (SAMOD) in 2004 in exchange for which MTN was allowed to replace Turkcell in the Irancell consortium.

   On this issue the POSA indicated that he would send Deputy Minister Aziz Pahad to Iran with South Africa's final answer on the matter.

   Deputy Minister Pahad did indeed visit Iran over two weeks ago. At the time Mr Larijani was out of the country and Deputy Minister Pahad could not convey POSA's message to him directly. He asked Amb. Saloojee to inform Mr Larijani that POSA indicated that SA would not be in a position to supply any defence related products to Iran. In addition it was the POSA's view that the matter of MTN has nothing to do with the Government of South Africa as it is a private business in which the Government of South Africa plays no role. The two matters should therefore be delinked.

Given the history of the matter (I summarise briefly below) the Ambassador was extremely reluctant to convey this message and he requested the Deputy Minister to convey the message directly to Mr Larijani's office.

As of now this message has not been conveyed to Mr Larijani.

**VISIT OF MR MOTTAKI**

During last week Mr Mottaki, MOFA of Iran, was sent by President Ahmadinejad to meet with POSA.

He was tasked to deal with the exact same issues.

Before his departure the Ambassador met with at the airport in Iran on the instructions of POSA with a view to explaining to MOFA of Iran that South Africa would prefer that they support the suggestions put forward by SA's ambassador to the UN re a mutual moratorium on any further action for 90 days.

MOFA of Iran was adamant that they would not agree to such a moratorium and that Iran is fully intent on exercising all its rights under the NPT.

He also indicated that he has been tasked by his President to get a direct answer from POSA on the defence related matters. He re-iterated their understanding that MTN was allowed to replace Turkcell in exchange for defence co-operation.

He advised the Ambassador that he (as former ambassador to Turkey) and the current President did not agree with the removal of Turkcell from the Irancell consortium but they were finally convinced by the office of the Supreme Leader that there are significant defence benefits in it for the country were MTN to be allowed into the process.

On that basis they withdrew their objections and allowed the process to proceed in MTN's favour.

As of now no formal feedback has been received by Amb. Saloojee about this visit on the defence related matter. His view is however that it is highly unlikely that POSA would have changed his position. If that was the case he would have been given a directive not to communicate the bad news to Mr Larijani.

As to the UNSC matter it is now a matter of public record what happened to the vote on Saturday. It is clear that South Africa also voted in favour of the sanctions albeit after a significant effort was made to water down the original wording.

According to the Ambassador the Iranians did not expect the voting to go otherwise although they were hopeful that South Africa would at least

abstain. As it is South Africa is now seen as having made a dramatic U turn on the matter and we will have to closely monitor the reaction of the Iranians to this fact.

## BRIEF RECAP OF HISTORY

It will be recalled that MTN only seriously got back into the process after our MOD visited the country.

At the time certain undertakings were given by MOD of SA to the then MOD of Iran around setting up certain technical committees who would commence work on a Memorandum of Understanding to be signed at a future date between the countries.

It is a matter of history that this did not happen.

You will also recall that during the negotiations in September 2005 Dr Mahmoudzadeh insisted on you signing that 1 page letter in which the two parties committed themselves to mutual co-operation on political and defence matters. It now transpires that he used that letter to indicate that MTN would support SAIRAN in its negotiations with the South African government for defence matters.

Obviously that was not MTN's understanding but it was certainly the way in which it was sold to the establishment in Iran.

## COMMENT

It would seem clear that the issue of defence co-operation has become a pressing matter with the government of Iran.

If regard is had to the latest UNSC Resolution there is a clear move towards dealing with Iran's conventional weapons capability. As noted earlier Russia has traditionally played the role of key weapons supplier to Iran. Given recent developments and the increasingly strained relationships between Russia and Iran, the country is actively looking at more secured suppliers of defence materials.

While up to now they have therefore politely pushed but nonetheless persistently so on their understanding of what the MOD of SA has promised, it is clear that they are now seriously expecting the Government of South Africa to deliver on its promises.

Because the entire political situation has now deteriorated significantly it is highly unlikely that the Government of South Africa will be prepared to sign any defence agreements or deliver defence materials to Iran.

Given the clear linkage that the Government of Iran has drawn between the defence assistance and allowing MTN into the country the likelihood that there will be serious blowback for MTN is increasing.

Because there has been a recognition of the non-business imperatives that drove MTN's entry into Iran, the Distant Thunder range of projects have been developed to deepen MTN's position, as opposed to and distinct from Irancell, inside Iran so that MTN would be able to rely on broad popular support for its continued presence.

More recently a more mid to long range strategy has been proposed to ensure that MTN puts in place an exit strategy that would ensure that it not be caught in a situation where it loses its entire investment in the country.

As a third dimension the resolution of our diplomatic support base was also proposed.

**AMBASSADOR'S RECOMMENDATION**

The ambassador has recommended that you attempt as a matter of urgency to contact POSA and impress upon him that the failure to resolve the defence matters to the satisfaction of Iran will have severe negative repercussions for MTN.

**MY RECOMMENDATIONS**

I am preparing a document that spell out the range of actions that can be taken against MTN and will submit that to you as soon as it is complete. In summarised form it can be said that there is every possibility that MTN could be effectively isolated from Irancell with very little negative effect on Irancell.

While 1 million subscribers will act as a defensive buffer for Irancell, it does not provide the same protection for MTN. This is because these subscribers are reflected locally as Irancell subscribers and not MTN. All the innovations are not sold as MTN innovations but as Irancell's.

All the efforts that Mr Dezfouli has made to project only Irancell as the operator has largely been successful and it will therefore be relatively easy to remove MTN from the scenario.

To give MTN a realistic chance to navigate through what is potentially going to be a difficult few months (if not years until the end of the current presidency in 2009), I make the following recommendations:

1. Implementation of Project Distant Thunder at the earliest opportunity. We could pre-empt some of the activity that is almost certain to be started in the public sphere against MTN. If an announcement could be made on Saturday 9 April it have great impact because it will be the first full working week of the Iranian New Year. (Dimension 1)

2. Approval of the creation of the committee to pursue mid to long term strategies for MTN's investment in Iran.(Dimension 2)

3. Finalisation of the diplomatic support initiative. The first consultant is still waiting for the transfer of the agreed amount. This is causing considerable anxiety in his mind and going forward we are going to need his support. We still

have not given the second consultant any indication whether we are seriously considering his request. He too is developing some anxiety and I have to field almost daily questions on it. (Dimension 3)

# EXHIBIT C

بهداد میرزایی، مترجم رسمی دادگستری

شماره پروانه: ۳۵۵۸

**Behdad Mirzai, Official Translator to
Iranian Justice Administration
License No.: 3558**

۸۱۰۱۶۴

جمهوری اسلامی ایران

شماره دفتر مترجم
قوه قضائیه – اداره کل فنی

## Islamic Republic of Iran
### Ministry of Communication & Information Technology

Ref.    770/73
Date    Feb. 21, 2004

The Esteemed Consortium of Irancell



Dear Sir or Madam:

This is to advise you that, pursuant to the result of examination of the tender envelopes of 2MDGSM, you are regarded as the provisional licensee. Please take all appropriate actions in accordance with the rules and regulations of tender.

Masoum Fardis
Director of 2MDGSM Project (Signed)



Parman Ertebat Co. (Private Joint-stock Co.)
Date of entry: Feb. 21, 2004; Recorded under No. 118-82601
--------------------------------------------------------------------
**True Translation Certified. April 12, 2004**
M-



**Islamic Republic of Iran**
**Ministry of Communication & Information Technology**
**Minister's Office**

Ref.   100/42577
Date   Feb. 22, 2004

Dear Mr. Mazaheri Eng.
Esteemed Minister of Finance & Economy



Pursuant to the process of tender on the 2MDGSM, as you are aware, the tender envelopes of the four consortiums of MTN Iran, Orascom Balli, Iranceil and MTC - which met the requirements - were opened on Feb. 18, 2004. And finally, bidding the highest price Irancell won the tender according to the tender rules and regulations. Therefore, they must soon take action to obtain the permit of foreign investment and have the consortium registered in Iran.

Hence, pursuant to the letter under Ref. 4/9/559 dated Dec. 09, 2003 (a copy enclosed) issued by that Ministry, please make appropriate orders that necessary cooperation be made by Technical & Economic Cooperation & Investment Organization.

Seyed Ahmad Motamedi
Minister of Communication & IT (Signed)

Copy to:
IT & Plan Vice Minister
Director of 2MDGSM project
Minister's Office

# EXHIBIT D



MOBILE TELEPHONE NETWORKS

**FAX :**

NO. OF PAGES:    5

| | |
|---|---|
| **TO:** | His Excellency, Mr. E. Mahmoudzadeh |
| **CC:** | His Excellency, Ambassador Yusuf Saloojee |
| **FAX:** | +98 21 254-7036 |

**FROM:** Irene Charnley

**DATE:** 16 November 2004

## MESSAGE:

Dear Mr. Mahmoudzadeh:

I am writing this letter to facilitate a meeting between Denel (Pty) Ltd and the IHRSC. Denel (Pty) Ltd is a government owned enterprise which manufactures helicopters and is a leader in the field of aviation. I was in a meeting with the CEO of Denel, Mr. Victor Moche, who advised me that efforts to set a meeting between Denel and the IHRSC are not taking off because of a failure in fascimile transmission.

I will greatly appreciate if you would pass on the attached correspondence to Eng. R. Riahi (D.M.D for Comm. Affairs) in the IHRSC and make arrangements for the meeting, as requested.

I trust you will be a great assistance and look forward to hearing from you soon.


Regards


**Irene Charnley**
**Commercial Director**

Signed on her behalf by Nkateko Nyoka


3 Alice Lane, Sandown Ext 38, Private Bag 9955, Sandton , 2146

Tel: (27) (11) 301-8220, Fax: (27) (11) 301-6990



# DENEL (Pty) Ltd

Reg No. 92/01337/07

Denel Building  PO Box 8322
Jochemus Street  Centurion  0046
Erasmuskloof  South Africa

## Facsimile

Tel: +27 12 428 0840

| | | | | | |
|---|---|---|---|---|---|
| **To** | : | Eng. R. Riahi | **From** | : | **Donald Ramfolo** |
| **Your Fax** | : | 09 98 21 953030 | **Our Fax** | : | **+27 12 428 0978** |
| **Pages** | : | 1 | **Date** | : | 10 November 2004 |

### IRAN HELICOPTER SUPPORT & RENEWAL CO(IHSRC)

Dear Sir,

We, at Denel feel honoured to have received your request for co-operation in the helicopter support field.

Denel has a history of over 30 years in the aviation sector and we are looking forward to send a delegation to Teheran to exchange view with your company.

Please do feel free to suggest any date after Eit but before the 15th December 2004.

Hoping to hear from you soon.

Best regards

**Col. D.A.M RAMFOLO**
**REGIONAL MARKETING DIRECTOR:**
**MIDDLE EAST & N.AFRICA**

If transmission is not complete, please contact us.

Denel (Pty) Ltd, Reg No 1992/001337/07, Denel Building, Jochemus Street, Erasmuskloof
P O Box 8322, Centurion, 0046, South Africa, Tel: (012) 428 0911, Fax: (012) 347 0300
Directors: S D M Zungu (Chairperson), V G M Moche* (Chief Executive Officer), R F G Cadiz, B G Halse**, Ms C C Mulder, Ms N Nyembezi-Heita, Dr I M Phillips, H D du P Potgieter*, Dr S P Sibisi
*  Executive Director
** Swedish



### In The Name Of ALLAH
### IRAN HELICOPTER SUPPORT & RENEWAL CO(IHSRC)

*To: Denel (pty) Ltd*
*Mr. Victor Moshe*

*Dear sir,*

We are pleased to inform you that Iran Helicopter Support and Renewal company (IHSRC) which concluded with a unique industrial and technical position in the Middle East with over 30-years experience has capabilities to overhaul different types of Bell , Agusta/Bell and Sikorsky helicopters both in civilian and military use and their major components such as Hydraulic , Dynamic , Engine and Electro Avionic. We would like to bring to your attention that recently we had a visit with his excellency Mr. Salooice Ambassador of South Africa in our company. we had discussion regarding possibilities of having joint venture cooperation between aviation industries of two countries and his excellency advised that your company as a major aviation industry in South Africa have all potential to produce parts and helicopter itself. Therefore we request you to send us in detail all capabilities of your company and will be appreciated to receive your delegation to discuss in detail regarding the fields that two companies can have cooperation.

*Best Regards*

*D.M.D for Comm. Aff.*
*Eng. R. Riahi*

➤ Buti ! Draft response please .

## Ramfolo, Donald

| | |
|---|---|
| **From:** | Ramfolo, Donald |
| **Sent:** | 23 June 2004 03:39 PM |
| **To:** | 'amalnick' |
| **Subject:** | RE: invitation letter |

Dear Dr. Amalnick

I am writing you this mail to confirm our invitation to A.I.O. to visit as at dates to be arranged.
Kindly send us tentative dates and the number of people coming to visit us. I will be pleased to hear from you
soon.

Remaining yours faithfully,

D.A.M. Ramfolo
Marketing Director: Middle East
Tel: +27 12 428 0840
Fax: +27 12 428 0978
Cell: 082 809 1010
Email: DonaldR@denel.co.za

> -----Original Message-----
> **From:** amalnick [mailto:amalnick@ut.ac.ir]
> **Sent:** 03 May 2004 12:37
> **To:** Ramfolo, Donald
> **Subject:** invitation letter
>
> Dear Mr. Col. D.A.M. Ramfolo
>
>     Refer to our telephone conversation last week and refer to our M.O.U.
> signed in Tehran dated 26.01.2004 in Aviation Industries Organization, we
> are awaiting for your invitation letter in order to visit you in your
> country for doing our negotiations on the interested subjects which we have
> discussed in Tehran.
>     So you are kindly requested to reply to my Email and let us know the
> final status of the invitation letter and if it is ready please  send a copy
> of it to me.
>
> I hope we can start our cooperation as soon as possible.
>
> Thanks & Best Regards
> Dr. M.S.Amalnick

## Ramfolo, Donald

**From:**    Ramfolo, Donald
**Sent:**    11 May 2004 04:43 PM
**To:**      'amalnick'
**Subject:** RE: invitation letter

Dear Dr. Almalnick,

Kindly accept my apologies for replying late to your mail. This was due to my hectic traveling arrangements. I must inform you that we did send an invitation to your organization via D.I.O about two months ago. It was according the agreement we reached in Teheran that we shall us D.I.O as a channel.

I hope that the D.I.O management has contacted you by now, if not please feel free to either contact them or me, so as to speed up the process.

Regards

D.A.M. Ramfolo
Marketing Director: Middle East
Tel: +27 12 428 0840
Fax: +27 12 428 0978
Cell: 082 809 1010 .
Email: DonaldR@denel.co.za

> -----Original Message-----
> **From:** amalnick [mailto:amalnick@ut.ac.ir]
> **Sent:** 03 May 2004 12:37
> **To:** Ramfolo, Donald
> **Subject:** invitation letter
>
> Dear Mr. Col. D.A.M. Ramfolo
>
> Refer to our telephone conversation last week and refer to our M.O.U. signed in Tehran dated 26.01.2004 in Aviation Industries Organization, we are awaiting for your invitation letter in order to visit you in your country for doing our negotiations on the interested subjects which we have discussed in Tehran.
> So you are kindly requested to reply to my Email and let us know the final status of the invitation letter and if it is ready please send a copy of it to me.
>
> I hope we can start our cooperation as soon as possible.
>
> Thanks & Best Regards
> Dr. M.S.Amalnick

# EXHIBIT E

Draft Letter

The Chairman
Irancell Company
Tehran
Islamic Republic of Iran

Dear Dr Mahnoudzadeh

**MTN'S PARTICIPATION IN IRANCELL COMPANY**

I want to take this opportunity to once more thank you for the invitation to the MTN Group to participate in and take up equity in Irancell Company.

In the first place I would want to indicate to you that the matters your raised relating to national security and defence matters between South Africa and the Islamic Republic of Iran has been fully accepted by MTN. To this end we have already briefed our Minister Defence on the successful discussions that have taken place between MTN and the Iranian shareholders in Irancell Company.

Furthermore we have taken immediate steps to ensure that the money to allow this project to commence will be available within the next week or two. A Board meeting has been convened where final approvals for the project will be sought. We are confident that the money will be available by next Friday in a bank account acceptable to Bank Melli Iran.

At the same we have drafted a Project Plan that will guide the Project team through the next six months to ensure that the company will be in a position to have a commercial launch by the end of the Iranian year (March 2006). You will appreciate that it will be critically important for all parts of the company to co-operate effectively from day one so that we do not loose any time. We are currently finalizing our project team and would appreciate your indications as to who will be joining that team from the side of the Iranian shareholders.

We also need to finalise the management, technical assistance and funding agreements as soon as possible. It would therefore be appreciated if you were to let me have the names and contact details of the lawyers and financial advisors that are going to assist the Iranian shareholders in getting these agreements done within the next 20 days.

In order to sequence all the various activities as efficiently and expeditiously as possible I will let you have a high level project plan together with responsibility allocations by tomorrow so that you can instruct your relevant people to start their preparations.

We are looking forward to making a huge success of what will no doubt be a difficult project but one which will add tremendously to the infrastructure of the Islamic Republic of Iran.

Please feel free to contact me in South Africa should you have any questions or you can always contact Chris Kilowan in Tehran.

Kind regards

PFN

# EXHIBIT F

*In the Name of God*

## Letter Agreement

On September 18, 2005 (27/06/1384) this letter agreement is concluded between local shareholders of Irancell Consortium and MTN, regarding the manner and conditions of transfer of 49% of Irancell Consortium shares to MTN. Parties herein agreed as follows:

1.  MOU dated June 24, 2005 concluded between MTN and Iranian shareholders is substantial valid guideline for this agreement.

2.  Fifty-one (51) percent of Irancell Consortium is owned by Iranian shareholders, forty-nine (49) percent shall be owned by MTN. Moreover, MTN and Iranian shareholders according to the agreement concluded between MCIT, Iranian shareholders, Bank Melli and Post Bank which is annexed to Addendum No. 1, agreed to put in trust twenty-one (21) percent of Irancell Consortium before Bank Melli as a trustee. Also the parties announce this agreement is valid and binding to all parties as well as MTN.

3.  The equity (share capital: 150 Million euros) and license fee shall be funded by MTN. In other words, MTN agrees to pay one-hundred (100) percent of MTN's portion of license fee and equity and eighty (80) percent of Iranian shareholder's portion of license fee and equity. Furthermore MTN and Bank Melli shall be responsible for arranging project financing. All the funding shall be on commercial terms acceptable to all parties.

4.  Conditions precedent to the contracted agreements shall be FIPPA approval, GSM license becoming effective and approval of the Exchange Control Division of South Africa Reserve Bank.

4.1 The parties agreed to coordinate and to follow the issues in Regulatory Authority and other relevant authorities.
4.2 MCIT will help MTN to receive the necessary approval from FIPPA and other authorities if necessary.
4.3 MTN will do its best to get approval from the Exchange Control Division of South Africa Reserve Bank within twenty (20) days of signature of the Addendum No. 1 to license agreement.

5.  Regarding the quorum and majority in general meetings, MTN is satisfied

with the existing provisions of the shareholders agreements subject to the following:

5.1  The resolutions on the below mentioned issues require the affirmative votes of MTN:

- Annual business plans and budgets of the Company, including, but not limited to, medium and long term financing;
- Major acquisitions, partnerships, formation of joint ventures or consortiums;
- Discontinuation of business activities;
- Entering into any agreement with persons, individuals or entities that are directly or indirectly related to Non-Iranian or Iranian Shareholders;
- Charging the assets of the Company in any manner which could have significant impact on the Company's ability to use or benefit from its assets in its ordinary course of business;
- Profit appropriations and dividend policy; and
- Approval of the annual accounts.

5.2  The parties agreed to amend items (m) and (p) of article 4.01 of the shareholders agreement in a manner that in the first and second invitations, the general meeting can not be held without the presence of non-Iranian shareholders or its representative.  At the third meeting the presence of any number of holders of the shares shall constitute a quorum. The same formula should be applied to quorum in the board.

6.  The fiscal year shall be decided according to Iranian law after advising with financial advisers.

7.  The cost and expenses incurred by Iranian shareholders, if any, due to transfer of Irancell's share to MTN shall be compensated by MTN.

8.  The cooperation between MTN and Iranian shareholders should be in the line of defensive, security and political cooperation.  MTN shall fully support cooperation regarding the aforementioned issues in South Africa.

9.  Shareholders agreement, Article of Associations, and license agreement which are submitted to MCIT are reviewed and substantially accepted by

MTN. Moreover, for this agreement to be effective, it is necessary that the above mentioned documents and related agreements be signed by MTN as well as to pay license fee and equity as provided in item 3 above within 20 days from the signature of Addendum. No. 1 to license agreement, simultaneously, the parties try to finalize the other relevant operational agreements.

**Iranian Shareholders**

**MTN**

# EXHIBIT G

# TOP SECRET

In a recent meeting with our ambassador the continued issue of the defence co-operation was discussed in detail. This is a summary of the meeting:

1.  He agrees that a commitment was given by the Government of SA through IC from our Minister of Defence. It is not clear what the exact nature and extent of the commitment was because the message was conveyed in a very cryptic fashion i.e. the ambassador was only told by IC that our MOD has agreed to give them the "Fish". This word was developed during a secret off-the record discussion between the ambassador and officials for the local foreign ministry and defence ministry around the entry of MTN into the second operator.

2.  Of course this initial indication of preparedness around defence co-operation was strengthened with the follow-up visit by our MOD and you were present when mutual commitments were made.

3.  During the visit of the parliamentarians to SA last year our MOD again committed the Government of SA to the establishment of technical working committees to investigate the nature and extent of possible co-operation.

4.  The ambassador agrees that this matter must be finalised and is now going to do the following:

    a.  Ask for a meeting with the MOD of Iran and get him to indicate what they are looking for in the context of current geo-political developments. He will ask that they reduce their request to writing.

    b.  He and I will then develop a memorandum with clear deliverables that IC will have to take to our MOD (because she is the one who initially obtained his commitment) and get him to commit in writing to at least establish these permanent joint technical committees. The logic here is that IC must explain to our MOD that he is the one who gave her the indication which she transferred to our ambassador; that his failure to follow through on his promise is causing continued embarrassment to our Government and is also placing a lot of strain on MTN. In this process we should get a clearer indication whether the "fish" that was promised to the Iranians is the same "fish" that our MOD promised to IC.

    c.  At the same time the ambassador will ask for a meeting with our President and Aziz to explain them in detail that the failure of the

Government of SA to make good on its promises has the potential to undermine SA's reputation as a country that can be trusted as an honest broker. He is due to be in SA on 24 June.

When we are in SA for the Board meeting perhaps we can discuss more detail but I think it is imperative that IC keeps up the pressure on our MOD because between the two of them they have forged this linkage that is going to be impossible to break except through a positive response in some form or the other from our Government.

# EXHIBIT H

5 July 2005

**Mr. Foruzandeh**
**The President**
Mostazafan Foundation
Resallat Highway, Africa Square
Tehran
Islamic Republic of Iran

**Dr. E. Mahmoudzadeh**
**Chairman**
Iran Electronics Industry
Shahid Langeri Street
No Bonyad Square
Tehran
Islamic Republic of Iran

Dear Mr. Foruzandeh & Dr. Mahmoudzadeh

**INVITATION TO VISIT THE MTN GROUP IN SOUTH AFRICA**

I refer to the recent meetings held at your offices in Tehran.

We appreciated the very hospitable manner that you received the MTN Group executive team. During the course of my visit it became clear to me that your organisations play a very important role in the economy of the Islamic Republic of Iran. I was also convinced that your organizations together with MTN could create a partnership that would be mutually beneficial in meeting all our objectives in the telecommunications sector in Iran.

I would be honoured if you could find the time to pay a visit to the MTN Group Head Office in Johannesburg, South Africa. This visit could take place at your earliest convenience during the month of July 2005. I would appreciate it if, during your visit, we could discuss the following two issues in greater detail with a view to reaching mutually beneficial agreements.

The two key discussion points are:

1.   The nature and extent of financial assistance that the MTN Group could provide to the Iranian partners in the Second Mobile licence in Iran.

2.      The nature and extent of the co-operation between your esteemed organizations and the MTN Group in current and future telecommunications projects in Iran.


With your consent I will ask Chris Kilowan from our office in Iran to liaise with your offices to co-ordinate the proposed visit, should it be possible in the envisaged time frame.

I look forward to hearing from you soon.

Yours sincerely



**PHUTHUMA F. NHLEKO**
**GROUP CHIEF EXECUTIVE**

# EXHIBIT I



# MEMORANDUM

| | | |
|---|---|---|
| TO | : | IRENE CHARNLEY |
| DATE | : | 11 DECEMBER 2006 |
| FROM | : | PHUTHUMA NHLEKO |
| **SUBJECT** | : | **CONSULTANCY AGREEMENTS** |

Dear Irene

With reference to the process in terms of which MTN International (Mauritius) Limited acquired a 49% equity interest in Irancell, you are authorized to finalise all agreements with the consultants that assisted the Company during the run up to and actual negotiating period, and to effect the necessary payments.

Kind regards

**PHUTHUMA F. NHLEKO**
**GROUP PRESIDENT & CEO**

# EXHIBIT J

# AGREEMENT FOR THE PROVISION OF CONSULTING SERVICES

## Between

## MTN INTERNATIONAL (MAURITIUS) LIMITED
## ("MTNI")
## And

## ARISTO OIL INTERNATIONAL SERVICES LIMITED LIABILITY
## COMPANY
### Registration No.732366
## ("THE CONSULTANT")



# INDEX

| NO. | CLAUSE HEADING | PAGE |
|---|---|---|

| 1 | Interpretation | 3 |
| 2 | Introduction | 3 |
| 3 | Commencement and Duration | 4 |
| 4 | Services and Service Fees | 4 |
| 5 | Termination | 5 |
| 6 | Duties and Responsibilities | 5 |
| 7 | Location | 6 |
| 9. | Property Belonging to the MTNI | 7 |
| 10. | Deductions | 7 |
| 11. | Ownership and Confidentiality | 7 |
| 12. | Disclosure | 7 |
| 13. | Breach | 8 |
| 14. | Notices and Domicilium | 8 |
| 15. | Whole agreement | 10 |
| 16. | Variation | 10 |
| 17. | Relation | 10 |
| 18. | Costs | 10 |



# 1      Interpretation

1.1      The head notes to the paragraphs in this agreement are for reference purposes only and shall not affect the interpretation of any part hereof.

1.2      Words importing the singular shall include the plural and *vice versa* and words importing one gender shall include the other genders.

1.3      "Business days" means all days other than Fridays, Saturdays, public and religious holidays;

1.4      "MTNI" means MTN International (Mauritius) Limited, a company duly incorporated in accordance with the laws of Mauritius

1.5      "The Consultant" means **Aristo Oil International Services Limited Liability Company**, a company duly incorporated in accordance with the laws of the United Arab Emirates;

1.6      "The Services" means the services effected by the Consultant for MTNI from time to time which are generally described in Annexure 1;

1.7      The annexures to this agreement form an integral part hereof and words and expressions defined in this Agreement shall bear, unless the context otherwise requires, the same meaning in such annexures

# 2      Introduction

2.1      MTNI, in the furtherance of its function, requires the Consultant to effect the Services.

2.2      The Consultant has expertise in and has the means and expertise to effect and complete the Services.

2.3      MTNI accordingly appoints the Consultant on an as and when needed basis, to perform the Services on the terms and conditions recorded in this Agreement and the Consultant accepts the appointment.

2.4      It is recorded that nothing in this Agreement, whether express or implied, shall be construed as promoting a relationship of employer and employee between the parties.



2.5    It is specifically recorded that the Consultant is an independent Consultant and neither an agent, nor an employee of MTNI and, as such, is not entitled to any of the benefits available to MTNI employees such as medical aid, leave pay, sick pay, and pension benefits.  All benefits to which the Consultant may be entitled are recorded in this Agreement and are afforded to the Consultant to assist MTNI in obtaining efficient provision of the Services by the Consultant.

2.6    Except when otherwise expressly authorised or directed in writing, the Consultant's authority to act for or on behalf of MTNI is strictly limited to the Services.  The Consultant will render Services on a non-exclusive basis.  It is understood by MTNI and confirmed by Consultant that no prior or existing commitments exist which would prevent the Consultant from accepting this present contractual relationship.

**3      Commencement and Duration**

3.1    Notwithstanding the date of signature hereof, this Agreement shall commence on 1 February 2005 and shall endure for a period of one (1) years unless terminated by either party on 30 (thirty) day's written notice to the other party or unless terminated earlier in terms of the provisions set out below.

3.2    Notwithstanding the above, the provisions of this Agreement relating to confidentiality and, if applicable, the restraints of trade shall endure for so long as provided in Annexure "B".

**4      Services and Service Fees**

4.1    The Consultant's Services shall be those as set out in Annexure "A".

4.2    In consideration for the Consultant Services effected by the Consultant, MTNI shall pay the Consultant a once off fee of United States Dollars four hundred thousand (US$400 000) at the end of one (1) year after MTNI entered into agreements to establish its presence in the Islamic Republic of Iran.

4.3    Payment shall be effected by MTNI by no later than the end of the first quarter of 2007.

4.4    The Consultant shall be responsible for all payment of any taxes, duties, etc. payable in the United Arab Emirates and accordingly the Consultant hereby indemnifies MTNI



against any claim of whatsoever nature, losses, costs, etc MTNI may incur/suffer as a result of any payment to be made to the Consultant.

## 5   Termination

5.1   Either party may elect to terminate this agreement on sixty (30) days written notice given to the other.

5.2   MTNI reserves the right to terminate this agreement without notice if the Consultant commits any serious or persistent breach of any of the provisions of this agreement or fails to carry out any of the Services in a fit and proper manner or if the Consultant is guilty of any criminal offence other than an offence which, in the opinion of MTNI, does not affect the Consultant's Services in terms of this agreement.

## 6   Duties and Responsibilities

6.1   The Consultant shall provide the Services in accordance with the written instructions of the designated MTNI representative and the parties shall agree on the deliverables as well as the turn around times on the work to be delivered by the Consultant from time to time.

6.2   The Consultant acknowledges and accepts that time is of the essence throughout the term of this Agreement and failure on the part of the Consultant to timeously fulfil any of his obligations under this Agreement may result in financial loss to MTNI.

6.3   Notwithstanding anything contained in this Agreement, the Consultant shall within the framework of his duties carry out the reasonable and proper instructions of the authorised representative, more specifically the Chief Representative of MTNI at all times in respect of the Services to be provided by him in terms of this Agreement: Provided that the Consultant shall not be subject to the control or supervision of the Chief Representative of MTNI in respect of the Consultant's operational methods in any particular day, during which the Services are effected by the Consultant. All work performed by the Consultant shall be subject to sign off by the Chief Representative.



## 7    Location

Services rendered by the Consultant will be effected at the Consultant's premises unless agreed otherwise from time to time. The Consultant shall however only have access to MTNI's premises to the extent necessary to effect the Services and shall wherever possible, taking into account the nature and scope of the particular Services, not effect the Services at MTNI's premises.

## 8.    The Consultant's Warranty

8.1    The Consultant hereby warranty that no other party has exclusive rights to his Services in the specific areas described herein and that the Consultant is in no way compromising any rights or trust relationship between any other party and the Consultant, or creating a conflict of interest for the Consultant or for MTNI or any possibility thereof. The Consultant further warrants that all Services provided hereunder will be performed personally by him or such other persons that are within and under his control in accordance with all applicable laws, orders and regulations of all government authorities having jurisdiction over this Agreement and particularly that he has complied with all of his statutory obligations. The Consultant shall indemnify MTNI against any and all liabilities, damages, claims, fines, penalties and expenses of whatsoever nature resulting from the Consultant's failure to comply with this clause 8.

8.2    The Consultant agrees to indemnify and hold MTNI harmless from any and all claims of other parties for breach of these warranties and against any claims of whatsoever nature and howsoever arising out of the acts or omissions of the Consultant whether negligent, intentional or otherwise.

8.3    Further, the Consultant represents and warrants to MTNI that he is not an official or employee of any government entity, agency or instrumentality that would cause the Consultant's performance of Service under this Agreement to be in violation of any applicable law or governmental ethical guideline.

8.5    Without limiting the Consultant's liability, the Consultant shall procure at the Consultant's sole expense, any and all insurance that is required by law. Prior to



providing the Services under this Agreement, the Consultant shall furnish MTNI copies of certificates of such legally required insurance, if any, applicable to such Services and held by Consultants on the date of execution of this Agreement or thereafter obtained.

8.6 The Consultant shall maintain true and correct records in connection with the Services performed under this Agreement and all transactions related thereto and shall retain all such records for at least 36 (thirty six) months after termination of this Agreement.

8.7 The Consultant shall not give to or receive from any director, employee or agent of MTNI or any affiliate any commission, fee rebate or any gift or entertainment of significant cost or value except as provided for under the terms of this Agreement. The Consultant shall promptly notify MTNI of any violation of this clause.

**9.      Property Belonging to MTNI**

On termination of this Agreement for any reason whatsoever the Consultant will be required to hand over to MTNI all MTNI's property in the Consultant's possession or under the Consultant's control including but not limited to any keys, security cards, SIM cards or other property of any nature whatsoever.

**10.      Deductions**

Should the Consultant at any time owe any amounts to the MTNI the Consultant hereby authorises MTNI to deduct such amounts owed or set off such amounts owed against any amount owed to the Consultant by MTNI.

**11.      Ownership and Confidentiality**

11.1 The parties have concluded a confidentiality agreement a copy of which is attached hereto marked Annexure "B" and forms part hereof.

**12.      Disclosure**

12.1 The Consultant acknowledges and agrees that it may be necessary for MTNI to disclose the fact of the Consultant's retention, the duties performed and the compensation paid, should there be proper inquiry from such a source as an authorised government agency or



should MTNI believe it has a legal obligation to disclose such information and the Consultant hereby authorises any such disclosures.

**13.**     **Breach**

If either party breaches any provision or term of this agreement and fails to remedy such breach within 7 (seven) days of the date of receipt of written notice requiring it to do so then the aggrieved party may declare a dispute in writing whereupon the parties will arrange to meet forthwith to resolve the dispute and failing the resolution of the dispute then the aggrieved party shall be entitled, in addition to any other remedy available to it at law, to cancel this agreement or to hold the other party to the terms of this agreement and claim specific performance, in either event without prejudice to the aggrieved party's rights to claim damages.

Where any of the parties wish to institute legal proceedings against the other, the jurisdiction shall be that of the High Court of South Africa, Witwatersrand Local Division..

**14.**     **Notices and Domicilium**

14.1     The parties choose as their domicilium citandi et executandi their respective addresses set out in this clause for all purposes arising out of or in connection with this agreement at which addresses all the processes and notices arising out of or in connection with this agreement, its breach or termination may validly be served upon or delivered to the parties.

14.2     For the purpose of this agreement the parties' respective addresses shall be –

14.2.1     as regards MTNI at

14.3          7th Floor, Africa Building

92 West Nahid Street

Africa Boulevard

Terhan

Telephone: +9821 2201 0907

attention: The Chief Representative

14.3.1       as regards Consultant at

19th Floor Intercontinental Business Offices

Suite 19C

Sheik Zayed Road

Dubai

United Arab Emirates

Tel number: +971-4-2956858

fax number:  +971-4-2652011

attention: The Managing Director

or at such other address in United Arab Emirates, not being a post office box or poste restante, of which the party concerned may notify the others in writing.

14.4       Any notice given in terms of this agreement shall be in writing and shall -

14.4.1       if delivered by hand be deemed to have been duly received by the addressee on the date of delivery;

14.4.2       if posted by prepaid registered post be deemed to have been received by the addressee on the 8th (eighth) business day following the date of such posting;

14.4.3       if transmitted by facsimile be deemed to have been received by the addressee 1 (one) business day after despatch.

14.5       Notwithstanding anything to the contrary contained in this agreement, a written notice or communication actually received by one of the parties from another including by way of facsimile transmission shall be adequate written notice or communication to such party.



## 15.   Whole agreement

This agreement constitutes the whole agreement between the parties as to the subject matter hereof and no agreement, representation or warranties between the parties other than those set out herein are binding on the parties.

## 16.   Variation

No addition to or variation, consensual cancellation or novation of this agreement and no waiver of any right arising from this agreement or its breach or termination shall be of any force or effect unless reduced to writing and signed by all the parties or their duly authorised representatives.

## 17.   Relation

No latitude, extension of time or other indulgence which may be given or allowed by any party to any other party in respect of the performance of any obligation hereunder or enforcement of any right arising from this agreement and no single or partial exercise of any right by any party shall under any circumstances be construed to be an implied consent by such party or operate as a waiver or a novation of, or otherwise affect any of that party's rights in terms of or arising from this agreement or estop such party from enforcing, at any time and without notice, strict and punctual compliance with each and every provision or term hereof.

## 18.   Costs

Each party shall pay its own cost of negotiating, drafting, preparing and implementing this agreement and the appendices to it.

**Signature Provisions**

Signed at _____ on this _____ day of _____ 2006

As witnesses:

1. _Haddadi_____

2. _____

3. _Hosseinzadeh_____
**for** ARISTO OIL INTERNATIONAL SERVICES LLC
**Duly Authorised**
**Name:** MOUSA HOSSEIN ZADEH
**Capacity:** MANAGING DIRECTOR

Signed at _____ on this _____ day of _____ 2006

As witnesses:

1. _CHRISTIAN ABRAHAM KILOWAN_____

2. _____

3. _____
**For**
**Duly Authorised**
**Name:**
**Capacity**

**Annexure "B"**


**Confidentiality and non disclosure agreement**


12


**Annexure "A"**

# SCOPE OF RESPONSIBILITIES:


**ARTICLE NO. ONE:**

Provide consulting services, introduce MTNI to key roleplayers, arrange meetings and generally provide support and assistance during the negotiations and conclusion of the necessary agreements that will provide for MTNI's entry into the Iranian Mobile Market.



# Aristo Oil International Services L.L.C

*Registration No: 732366*

# INVOICE

P O Box 29901 Dubai – United Arab Emirates
Phone +971-4-2956858  Fax +971-4-2954161

DATE: 2007-04-03

**TO:**
MTN International (Mauritius) Limited
Port Louis
Le Caudan
Mauritius

**FOR:**
Consulting and Support – Iran Licence

| DESCRIPTION | AMOUNT |
|---|---|
| Provided consulting and support services during the period 2005 and 2006 in accordance with the signed agreement between MTN International (Mauritius) Limited and Aristo | US$400,000 |
| TOTAL | US400,000 |

Please transfer payment to: Commercial Bank of Dubai
SWIFT Code: CBDUAEAD
Account holder name: Mousa Hosseinzadeh
Account Number: 1000546125
Payment is due within 30 days.
If you have any questions concerning this invoice, contact **arsitoco@eim.ae**

**Thank you for your business!**

# EXHIBIT K

# CONFIDENTIAL MEMORANDUM

Irene,

I have e-mailed you the agreement for Long J and the money should be paid into the following bank account:

MOUSA ABOLFAZL HOSSEINZADEH
COMMERCIAL BANK OF DUBAI
MAIN BRANCH – DUBAI
ACCOUNT NUMBER: 100054 REDACTED
CHEQUE ACCOUNT

Judging from the SMS I sent through to you this morning Long J is going to need the cash pretty soon and I suspect he is going to start pressing me for a date on which the transfer will take place.

While finalising this matter I kept on thinking that we are paying the consultants this money and they have done significantly less than our other friend in the country. In fact the consultants will do nothing more for us while we will continuously be tapping our friend for information and advice.

As you are well aware we are getting high quality information and the support provided has been excellent. In fact, he has assisted way and beyond his duty to us.

You are also aware that he knows we are paying the consultants some money.

While I know we never even suggested that we would pay our friend some money, I was wondering whether we could not out of our own volition offer to make some monetary contribution to express our gratitude. I would like to discuss this with you when I am in SA. He will also be in SA at the time and if there is agreement all round then you could have a discussion with him at the time.

Thanks

Chris

# EXHIBIT L

GILDENHUYS LESSING MALATJI
A T T O R N E Y S

OUR REF

PHILLIP STEYN/ MINé
0142 7130

DIRECT TEL NO
(012) 427 3700 # 4013

DIRECT E-MAIL
mrobbertse@glmi.co.za

DIRECT FAX
(012) 460 7204

YOUR REF

PRETORIA
1ST & 2ND FLOOR
BROOKLYN COURT
361 VEALE STREET
BROOKLYN 0181
PO BOX 619
PRETORIA 0001
DOCEX 4 PRETORIA
E-MAIL glmi@glmi.co.za
WEB ADDRESS www.glmi.co.za
TEL   +27 12 427 3700
FAX   +27 12 427 3777/3773/3707

Directors
T S S MALATJI BPROC LLB
J H MARKGRAAFF BCOM LLB
G H J KRUGER BPROC LLM
J F DE BEER BPROC DIP INSOL LLM
J C M DA SILVA BPROC ADL CSL
ADPFL
M SCHWARTZ BA LLB
M T J MOGASHOA B PROC
W C CILLIERS BA LLM
S B P ZUNGU BPROC
A MAHOMED BPROC BA(HONS) LLB
N DE WITT BLC LLB
M L SWART BLC LLB
S ELOFF BCOM LLM
T M KANYANE BPROC LLB
R PHOSA BPROC DIP CYBER LAW
CERT ENTERTAINMENT LAW
D M DIALE B IURIS LLB HDIP CO LAW

Senior Associates
C F ROUX BPROC CERT 3RD PARTY
COMP
P STEYN BPROC
Z E SHAW BPROC
V GOVENDER BPROC LLM
A GRAY BPROC

Associates
K O MABUNDA BPROC LLB
H M CHAANE LLB
T VILAKAZI LLB
M J LEKHU LLB
B L MASIA LLB

Professional Assistants
J G ADOLPH BCOM LLM
A BEZUIDENHOUT LLM
M SITHOLE LLB
A P VENTER BCOMM(LAW) LLB
K C GOLOLO BPROC LLB
J W GREEN LLB
L KOEN BLC LLB
S C MDLULI LLB

Consultants
I D LESSING B IURIS BA(HONS) LLB
E VD VYVER B IURIS HDIP TAX LLM

Financial Manager
E G CANDIOTES

Information Systems Manager
C DOMAN BBIBL (HONS)

Human Resource Manager
Y KRAUKAMP BA

Office Manager
I MATHULA

YUSUF SALOOJEE                                    29 February 2008

PER REGISTERED MAIL

PRIVATE BAG X152
PRETORIA
0001

Sir

**TRANSFER: CJ & L KOEN / Y & L SALOOJEE**

**ERF 1567 FEARIE GLEN EXT 6**

We refer to the above matter and our letter dated 5 February 2008.

Could you kindly acknowledge receipt of the Title deed T 66722/2007 which was sent to you on the 26th of September 2007 on the duplicate hereof in order for us to close our file.

Acknowledgement can be faxed to (012) 460 7204 or posted to PO 619, Pretoria, 0001.

Thank you in advance.

Yours truly,

*Robbertse*

**GILDENHUYS LESSING MALATJI INC**

Per: Miné Robbertse

Received by: _____

Date: _25/May 08_

## FW: ERF 1657 FAERIE GLEN   Inbox

 Expand all   Print all   Forward all

☆ **Annegret Otto** <AOtto@glmi.co.za> to **Latacha**, Roy, me show details 2:34 pm (3 hours ago)   ↩ Reply | ▼

Kindly note that we have not received any faxes. However, we confirm that we have received an amount of R270 000,00 on 19 April 2007(amount already invested). An amount of R1 400 000,00 was deposited into our trust account on 26 April 2007 - the latter was reflected in our trust account this morning. We shall now proceed to invest the balance of the purchase price and pay transfer duty to SARS , We shall also obtain a clearance certificate from City of Tshwane.
>>> "Roy Esakov" <roy@sirpretoria.co.za> 30/04/2007 11:57 AM >>>
- Show quoted text -

↩ Reply   ↩ Reply to all   → Forward   Invite Annegret to Gmail

# EXHIBIT M

# STRICTLY CONFIDENTIAL

## MEMORANDUM

**TO:**      **Phuthuma Nhleko**

**FROM:**  **Chris Kilowan**

**DATE:**   **10 NOVEMBER 2007**

## SUBJECT: OUTSTANDING ISSUES

Pursuant to my last communication with you I set out below the issues that I believe are still outstanding here and will have an impact one way or the other on MTN's investment.

1. **EQUALISATION OF MD'S SALARY**

   While this has never been raised directly by the MD with you or Jamal, I am aware that he is feeling aggrieved over the fact that he is earning less than some of the level 4 MTN Expats in MTN Irancell.

   The MD has the expectation that MTN would compensate him in line with the packages that other MTN MD's are getting with operations that are of similar size and complexity. In his view MTN Irancell is now the 3rd biggest operation in MTN and yet he is being treated worse than any other MD.

   He is also fully aware of the package the COO is getting and it is a sore point. His recent increased levels of co-operation should not be seen as signs of happiness. He is also aware of her views that he does not deserve to be compensated better.

   As I understand it Ferdi is currently trying to finalise the cost recovery agreement and I will be very surprised if any significant movement is going to be made until you address the MD directly on his package and offer some improvements.

2. **FINALISATION OF CONTRACT WITH SHORT JOHN**

   Subsequent to our last discussion on this matter at the beginning of the year I did not do anything about the agreement,

preferring to wait until December of this year to do an agreement that will be done in light of the actual delivery over the year.

I can certainly state that he has come to the party on every occasion that I called upon him. The fact that the quid pro quo that has threatened at one stage to be the primary stick with which we could be hit has now largely disappeared is because of his efforts.

The initial concessions on promised support for the revenue share issue was because of his direct involvement and taking me along to meetings that are normally confined to members of the diplomatic community.

With me out of the picture he will probably be the only friendly source of information and interaction for MTN on this side.

I would recommend that MTN finalise arrangements with him and offer fair compensation commensurate with the huge role he has played right from the outset.

3. **RENEWED APPRAOCH BY LONG JOHN**

I have communicated this to you a few weeks ago and recently forwarded an SMS from him.

The background to this new approach is centred in planned developments within the area that he is currently working.

Whatever his motivations, it is not something that should be ignored. While he has very little power to do anything positive, he can be a destructive force or simply an unnecessary distraction.

4. **INVESTIGATION INTO PRE-AQUISTION ACTIVITIES**

This issue is something that was initially raised as part of the information supplied by our friend under three above when it became clear that he was not going to get a quick answer on his further approach. At first glance it seemed as a method to try and put some pressure on MTN.

At the end of a meeting I had today with Mr Mokhber, he also raised this issue as an aside and it would now seem that questions are in fact being asked about meetings that you and/or Irene had with certain (undisclosed at this stage) individuals in Dubai and/or London and/or Saudi Arabia.

I am beginning to get the sense that a file is being compiled on real and/or imagined missteps that MTN might or might not have

committed in its endeavour to get the licence. The reasons are not clear and the objective with such a completed file even less clear.

5. **SHAREHOLDER LOANS**

As I indicated before, this is an item that is going to continue to determine the nature and level of co-operation MTN is going to receive from both Mr Mokhber and Dr Mahmoudzadeh.

The MD was again expressing his concern today that both these gentlemen have done very little, if anything, to support him on the revenue share issue. His view is still that the three of you should sit down and the right environment should be created for them to broach the subject with you.

I think Mr Mokhber is going to withdraw completely from MTN Irancell. This fact, linked to his views as articulated under point 6 below, means that we should not expect huge positive support for anything that will perception wise benefit MTN more than anybody else.

6. **PERSISTENT NEGATIVE VIEWS ABOUT SOME MTN EXPATS**

I beg your forgiveness if I sound like a record with a stuck needle but I would not want to be accused of not alerting you to a serious risk to MTN's investment. In my meeting today Mr Mokhber gave perhaps his clearest condemnation to date of MTN's decision to appoint Jyoti as COO.

In his view MTN made a mistake and inflicted a huge insult on Iran by placing her here. As I have pointed out to you before there are similar negative views from other influential quarters in Iran.

It has always been my view that you are ignoring these views at MTN's peril because when you are really going to need the support of Mr Mokhber and the power circles that he moves within, you might find that such support will either not be forthcoming or will come with an unpleasantly large price tag.

There is also a rapidly solidifying view, with me being offered evidence, that some MTN employees are either directly or indirectly being compensated by Ericsson to champion its cause within MTN Irancell.

Two recent examples have been pointed out to me.

**STRICTLY CONFIDENTIAL**                                              **Page 4 of 4**

The first one relates to the relentless push from MTN's side to kick out Alcatel and replace it with Ericsson in region 6. As you will recall Ericsson's performance has been dismal in region six, and some are saying that we might as well have kept Alcatel in there for all the good that Ericsson did in the region.

The second one relates to the effective hatchet job that was done on Huawei in the IN tender to make Ericsson look as the only real option, even at a more than Euro 8 million higher price tag and despite the fact that Huawei is replacing Ericsson IN systems in some operators.

I tried to create some balance when this last allegation was brought to my attention but I am not sure that this is going to do anything to dissuade our technical team from pursuing their determined course of action.

The above views are offered simply in an effort to a priori contextualise some of the things that might be coming your way in the next few months. Hopefully it will be of assistance in formulating appropriate responses.

# EXHIBIT N

**MEMORANDUM**

Meeting Report Re: UAV

A meeting was held this morning with GrID in Centurion to establish what was available in SA regarding the above.

There are currently 3 companies that work in this field and they work together on a number of projects.

The companies are:

1. Kentron (A Denel subsidiary) – based in Irene

   This company has the **Seeker** that is a strategic UAV in the sense that it is of a much higher specification and can remain in the air for several hours with high resolution video relay back to its control and command centre. Can be integrated into a long term surveillance and patrol function.

   Take off from any runway or runway like piece of land and land like a normal plane.

2. ATE (linked to Thint [French defense industry company] - based in Midrand

   This company has the **Vulture** which is a tactical aerial vehicle in the sense that it can be used for target acquisition in real time.

It takes off from a inclined ramp on the back of a truck and returns to a catch mat or net. You do not need a run way for this.

3. SAAB GrIDS (70% owned by SAAB in Sweden) – based in Centurion

    This company works closely with the above two in the area of putting together turnkey solutions for clients using either one of the above vehicles. Being part of the SAAB group they also have access to a wide array of UAV (civilian as well as military from the SAAB stable).

From a procurement process point of view it is possible to procure the vehicles through different intermediaries depending on the nature of the end client requirements.

Contacts have been made with Roeland De Vries and Johan de Clerk (SAAB GrIDS) who are willing to participate in further discussions and who can facilitate contact with other key role players in this area.

# EXHIBIT O



# MIDDLE EAST AND IRAN

# December 2006

Presentation Confidential between MTN and audience



# MTN'S ENTRY INTO THE MARKET

# TIME LINE


everywhere you go

| November 2005 | November 2005 |
| Agreements Signed | Licence Awarded to Irancell |

**September 2005**
MTN Invited to buy
into Irancell

**April 2005**
MTN Iran Office Launch

**August 2004**
MTN Board Approves
Establishment of presence
In Iran

**February 2004**
Turkcell Consortium
Wins

**December 2003**
MTN Bid Submitted

**March 2004 – May 2005**

Iranian Parliament commence
enquiry into the "Turkcell"
contract and eventually passes
the "Single Article Act" in May
2005.
This changed the shareholding
structure (Foreigners could
now only hold 49% equity) and
imposed other obligations

**The defining characteristic of this transaction was the political forces that were marshalled in support of MTN and it can therefore be concluded on an unequivocal basis that MTN's entry into the Islamic Republic of Iran was at its core due to political decisions taken at the highest levels in Iran**

# EXHIBIT P

*MTN Group: Media Release* 

**12 March 2012**

**MTN Denounces Turkcell's Extortionate Litigation Threat and Refusal to Cooperate with Independent Investigation**

The South African mobile phone company MTN today strongly condemned Turkcell's attempt to use the threat of a U.S. legal claim to extort money from MTN.  The company also strongly criticised Turkcell's refusal to cooperate with the independent investigation that MTN has set up, headed by the eminent British supreme court judge, Lord Hoffmann.

Turkcell had threatened MTN with litigation in the United States alleging claims of corruption in relation to MTN's bid to participate in the second mobile phone network in Iran.  In 2005, a consortium that included MTN was awarded the licence.  MTN have appointed Lord Hoffmann to lead an independent investigation of the allegations.  Although MTN believes there is no legal merit to Turkcell's claims and no basis for a U.S. court to consider them, it had nonetheless sought to obtain Turkcell's cooperation with the independent investigation.

Talks between MTN and Turkcell have broken down as a result of Turkcell's extortionate demands for damages and their threat to start a frivolous lawsuit in the U.S. MTN is committed to resolving the issue through Lord Hoffmann's inquiry.

"Turkcell's threat to abuse the U.S. legal system to pressure MTN will not succeed," said an MTN spokesman.  "MTN wants Turkcell's cooperation with the independent investigation."

Turkcell's accusations involve conduct alleged to have taken place in South Africa and Iran, and have no connection to the United States.  The U.S. Supreme Court is widely expected to restrict such claims in a case that was argued last week.

Lord Hoffmann, who was born in South Africa, is widely regarded as the pre-eminent legal figure in the United Kingdom over the last 20 years.   He has a strong reputation for independence.  Over a long career, he has proven his willingness to challenge the actions of governments of all political persuasions.

MTN is a leading mobile telecommunications group, operating in 21 countries in Africa, Asia and the Middle East. It works in some of the poorest countries in the world where widening use of mobile telephones has been a major force in economic and political liberation.  MTN remains committed to its operations in Iran and elsewhere on behalf of all its customers.  South Africa has not imposed any economic sanctions against Iran.  Working with international legal advisors, MTN has maintained its policy of operating at all times within the various international sanctions regimes which apply to Iran.

*Issued by MTN Group Corporate Affairs*

**About the MTN Group**

Launched in 1994, the MTN Group is a multinational telecommunications group, operating in 21 countries in Africa, Asia and the Middle East. The MTN Group is listed on the JSE Securities Exchange in South Africa under the share code: "MTN." As of December 2011, MTN recorded 164.5 million subscribers across its operations. Visit us at www.mtn.com.

**For more information, please contact:**

Xolisa Vapi on +27 83 200 4363 or email: vapi_xo@mtn.co.za